[L.A. No. 30308. In Bank. Dec. 27, 1974.]

WESLEY S. BURROWS, Petitioner, v.
THE SUPERIOR COURT OF SAN BERNARDINO COUNTY,
Respondent;
THE PEOPLE, Real Party in Interest.

COUNSEL

John R. Sheehan for Petitioner.

Charles C. Marson, Joseph Remcho, Peter E. Sheehan, Deborah Hinkel, Toby Sherwood, Dennis K. Metzler, John R. Deacon, Robert W. Eisfelder, Laurie S. Harris, Gail M. Title and Norman L. Wilky, Jr., as Amici Curiae on behalf of Petitioner.

Lowell E. Lathrop, District Attorney, Joseph A. Burns and Carl E. Davis, Deputy District Attorneys, for Respondent and for Real Party in Interest.

OPINION

**MOSK, J.**—Petitioner is an attorney suspected of having misappropriated the funds of a client. Respondent court issued a warrant authorizing

the search of his office; pursuant thereto, the police conducted a search of his office files as well as his automobile, and seized a large number of documents. Thereafter a detective contacted several banks in which petitioner maintained accounts, and without a warrant or any court process obtained from at least one bank photostatic copies of petitioner's financial statements. Ultimately petitioner was charged with grand theft. He moved to suppress the evidence obtained from his office, automobile and the bank. (Pen. Code, § 1538.5.) The motion was denied, and in this proceeding he seeks a statutory writ of mandate to annul the court's order and to compel it to grant the motion.

Carl E. Davis, a deputy district attorney of San Bernardino County, appeared before a magistrate on December 29, 1971, and testified as follows: Petitioner represented Harold D. Miller in connection with an action against Miller for child support. Miller was ordered by the court to make payments of $50 a month to his former wife, Mrs. June Trower. According to Miller, petitioner requested that these payments be sent to him, promising that he would transmit them to the court trustee, who would in turn forward them to Mrs. Trower. Miller stated that he had made payments to petitioner from June through December 1971, but Mrs. Trower claimed that she had not received any of these payments, nor had the court trustee. Petitioner's legal secretary was told by his bookkeeper that the checks received from Miller were placed in petitioner's trust account at the Bank of America in Victorville, and that the funds were not paid out of that account to Mrs. Trower. Some of Davis' testimony was supported by documentary evidence.

Based upon this information, the judge issued a warrant authorizing the search of petitioner's office for "all books, records, accounts and bank statements and cancelled checks of the receipt and disbursement of money and any file or documents referring to Harold D. Miller, June Trower, June Miller or Stacy Miller."

On December 29, Davis and another deputy district attorney, accompanied by two deputy sheriffs, entered petitioner's office, and over his objection, commenced an exhaustive search of his files, desks and closets. The search, which took two or three hours, was not limited to documents relating to the persons specified in the warrant. Rather, the officers, under Davis' direction, examined all of petitioner's financial records from 1969 onward, and they removed hundreds of individual items such as account books, bank statements, and cancelled checks, only a few of which related to the named individuals.

During the course of the search, some check stubs were found, but the checks to which they related could not be located. One of the officers asked petitioner's permission to search his automobile, which was parked outside the office. The evidence is conflicting as to whether petitioner consented to the search of the car. The officer testified that petitioner gave him permission to examine the contents of the car, while petitioner denied having done so. Although numerous papers in the car were examined, only one checkbook was ultimately taken from the car.

A few days thereafter the material taken in the search was transmitted to Detective K. A. Kutch of the San Bernardino Sheriff's Department. Kutch contacted several banks in which petitioner maintained accounts and requested them to provide copies of petitioner's bank statements, as well as other material relating to petitioner's financial transactions. Although the record does not clearly establish the extent to which the banks complied with these requests, in at least one instance photocopies of petitioner's bank statements were provided to the officer.

The prosecution made photocopies of the material taken in the search of the office. Upon petitioner's motion the court ordered the return of the original records, but denied the motion to suppress the copies. It found that there was probable cause to issue the warrant, that the evidence seized was as described in the warrant, and that, although the search of petitioner's car was not authorized, petitioner had consented there-█ Moreover, the court found the search and seizure of the bank records to be reasonable.[1]

## I

Initially, we discuss the most significant and novel issue in this case: whether the police violated petitioner's rights under the California Constitution, article I, section 13,[2] in obtaining, without benefit of legal process, copies of statements from a bank in which he maintained an account. We have held, consonant with *Katz* v. *United States* (1967) 389 U.S. 347, 350-352 [19 L.Ed.2d 576, 581-582, 88 S.Ct. 507], that, in determining whether an illegal search has occurred under the provisions

---

[1]The People do not claim that the return of the original documents has any effect upon the legality of the search. It is settled that since photostatic copies of illegally seized documents are as much the product of an illegal search and seizure as the original papers themselves, the exclusionary rule is equally applicable to the photostats. (*People* v. *Berger* (1955) 44 Cal.2d 459, 462 [282 P.2d 509].)

[2]Article I, section 13, of the California Constitution provides, in part: "The right of the people to be secure in their persons, houses, papers, and effects against unreasonable seizures and searches may not be violated . . . ."

of our Constitution, the appropriate test is whether a person has exhibited a reasonable expectation of privacy and, if so, whether that expectation has been violated by unreasonable governmental intrusion. (*People* v. *Krivda* (1971) 5 Cal.3d 357, 364 [96 Cal.Rptr. 62, 486 P.2d 1262]; 8 Cal.3d 623-624 [105 Cal.Rptr. 521, 504 P.2d 457].)

It cannot be gainsaid that the customer of a bank expects that the documents, such as checks, which he transmits to the bank in the course of his business operations, will remain private, and that such an expectation is reasonable. The prosecution concedes as much, although it asserts that this expectation is not constitutionally cognizable. Representatives of several banks testified at the suppression hearing that information in their possession regarding a customer's account is deemed by them to be confidential.

In the present case, although the record establishes that copies of petitioner's bank statements rather than of his checks were provided to the officer, the distinction is not significant with relation to petitioner's expectation of privacy. That the bank alters the form in which it records the information transmitted to it by the depositor to show the receipt and disbursement of money on a bank statement does not diminish the depositor's anticipation of privacy in the matters which he confides to the bank. A bank customer's reasonable expectation is that, absent compulsion by legal process, the matters he reveals to the bank will be utilized by the bank only for internal banking purposes. ■ Thus, we hold petitioner had a reasonable expectation that the bank would maintain the confidentiality of those papers which originated with him in check form and of the bank statements into which a record of those same checks had been transformed pursuant to internal bank practice.

We next determine whether the police unreasonably interfered with petitioner's expectation of privacy. It is significant in this connection that the bank provided the statements to the police in response to an informal oral request for information about all of petitioner's accounts. Thus, the character, scope, and relevancy of the material obtained were determined entirely by the exercise of the unbridled discretion of the police. If this search may be deemed reasonable, nothing could prevent any law enforcement officer from informally requesting and obtaining all of a person's or business entity's records which had been confided to a bank, though such records might have no relevance to a crime, if any, under investigation; and those records could be introduced into evidence in any subsequent criminal prosecution.

The People advance no governmental justification for such a sweeping exploratory invasion into an individual's privacy. Their primary assertion is not that it is essential to effective law enforcement to obtain bank records without judicial process, or even that the interests of a person in the confidentiality of his financial affairs is outweighed by the advantages to society in disclosure of the information. Instead, it is argued, banks have an independent interest in voluntarily cooperating with law enforcement officers because financial institutions desire to foster a favorable public image, and like any good citizen, to assist in the detection of crime. However laudable these motives may be, we are not here concerned with the conduct or reputation of banks, but with whether the police violated petitioner's rights by obtaining from banks, without legal process, documents in which petitioner had a reasonable expectation of privacy.

We are aware that numerous federal cases have held that a depositor has no proprietary interest in the records of his accounts which a bank maintains, and that he has no standing on Fourth Amendment grounds to resist a subpoena or summons directed to the banks ordering the production of such records. (See, e.g., *United States* v. *Gross* (8th Cir. 1969) 416 F.2d 1205, 1212-1213; *Harris* v. *United States* (9th Cir. 1969) 413 F.2d 316, 317-318; *Galbraith* v. *United States* (10th Cir. 1968) 387 F.2d 617, 618.) However, it is worthy of note that the foregoing and other federal cases involved more than an informal request for information; the material was furnished in response to a summons or subpoena issued either by an administrative body in connection with an investigation, which process is enforced by judicial order (*Interstate Commerce Comm.* v. *Brimson* (1894) 154 U.S. 447, 485 [38 L.Ed. 1047, 1060, 14 S.Ct. 1125]), or by a court in the context of a criminal proceeding.

If the federal cases were to be interpreted more broadly than their facts justify, we would find their rationale unconvincing. In *Katz* v. *United States, supra,* 389 U.S. 347, 353 [19 L.Ed.2d 576, 583], it was said that the " 'premise that property interests control the right of the Government to search and seize has been discredited.' " The mere fact that the bank purports to own the records which it provided to the detective is not, in our view, determinative of the issue at stake. The disclosure by the depositor to the bank is made for the limited purpose of facilitating the conduct of his financial affairs; it seems evident that his expectation of privacy is not diminished by the bank's retention of a record of such disclosures.

The People assert that no illegal search and seizure occurred here because the bank voluntarily provided the statements to the police, and

the bank rather than the police conducted the search of its records for papers relating to petitioner's accounts. ▮ If, as we conclude above, petitioner has a reasonable expectation of privacy in the bank statements, the voluntary relinquishment of such records by the bank at the request of the police does not constitute a valid consent by this petitioner. Just as one may not validly consent to the search of the personal effects of another (*People* v. *Cruz* (1964) 61 Cal.2d 861, 866-867 [40 Cal.Rptr. 841, 395 P.2d 889]; *People* v. *Daniels* (1971) 16 Cal.App.3d 36, 42-45 [93 Cal.Rptr. 628]; *People* v. *Baker* (1970) 12 Cal.App.3d 826, 835-836 [96 Cal.Rptr. 760]), or to the entry and search of premises lawfully occupied by another (*Krauss* v. *Superior Court* (1971) 5 Cal.3d 418, 422 [96 Cal.Rptr. 455, 487 P.2d 1023]), so the fact that the bank voluntarily acceded to a police officer's request to deliver papers regarding petitioner's account cannot serve to validate the governmental conduct. It is not the right of privacy of the bank but of the petitioner which is at issue, and thus it would be untenable to conclude that the bank, a neutral entity with no significant interest in the matter, may validly consent to an invasion of its depositors' rights. However, if the bank is not neutral, as for example where it is itself a victim of the defendant's suspected wrongdoing, the depositor's right of privacy will not prevail.

Our rationale is consistent with the recent decision of *United States* v. *Miller* (5th Cir. 1974) 500 F.2d 751. In *Miller,* the United States Attorney, without the defendant's knowledge, issued subpoenas to two banks in which the defendant maintained accounts, ordering the production of "all records of accounts" in the name of the defendant. The banks voluntarily provided the government with copies of the defendant's checks and a deposit slip; these items were introduced into evidence at the trial which led to his conviction. The circuit court reversed the conviction. It held that the defendant's rights under the Fourth Amendment were violated by the search because the subpoena was issued by the United States Attorney rather than by a court or grand jury, and the bank's voluntary compliance with the subpoena was irrelevant since it was the depositor's right to privacy which was threatened by the disclosure.

▮ We hold that any bank statements or copies thereof obtained by the sheriff and prosecutor without the benefit of legal process were acquired as the result of an illegal search and seizure (Cal. Const., art. I, § 13), and that the trial court should have granted the motion to suppress such documents.

## II

Since we have concluded that petitioner's motion to suppress should have been granted ·on the basis of the provisions of the California

Constitution, it is not necessary to consider his rights under the Fourth Amendment to the United States Constitution. However, a recent case of the United States Supreme Court, relied upon by both parties, warrants discussion.

In *California Bankers Assn.* v. *Shultz* (1974) 416 U.S. 21 [39 L.Ed.2d 812, 94 S.Ct. 1494], an association of bankers, a bank, and some of its customers challenged the validity of the Bank Secrecy Act of 1970. (12 U.S.C. §§ 1829b, 1730d, 1951-1959; 31 U.S.C. §§ 1051-1122.) The act empowers the Secretary of the Treasury to adopt broad regulations compelling banks to record their customers' transactions and requiring that the banks as well as private persons make reports of a broad range of financial transactions. Pursuant to this authority, the Secretary promulgated regulations directing banks to report each deposit, with-drawal or transfer involving domestic transactions in currency of more than $10,000. (31 C.F.R. § 103.22.)

The United States Supreme Court held, in a six-three decision, that the bank's rights under the Fourth Amendment were not abridged by the regulation, and that the depositor plaintiffs lacked standing to challenge the reporting requirement because there was no showing that they engaged in the type of transaction to which the regulation referred.

The concurring views of two justices who provided the necessary votes to create a majority are of particular interest. Justice Powell's opinion, joined by Justice Blackmun (416 U.S. at p. 78 [39 L.Ed.2d at p. 850]) makes clear that a significant extension of the reporting requirement would pose substantial constitutional questions, and that concurrence with the majority was based upon the provisions of the act as narrowed by the regulations. He wrote, "In their full reach, the reports apparently authorized by the open-ended language of the Act touch upon intimate areas of an individual's personal affairs. Financial transactions can reveal much about a person's activities, associations, and beliefs. At some point, governmental intrusion upon these areas would implicate legitimate expectations of privacy. Moreover, the potential for abuse is particularly acute where, as here, the legislative scheme permits access to this information without invocation of the judicial process. In such instances, the important responsibility for balancing societal and individual inter-ests is left to unreviewed executive discretion, rather than the scrutiny of a neutral magistrate. *United States* v. *U. S. District Court,* 407 U.S. 297, 316-317." (416 U.S. at pp. 78-79 [39 L.Ed.2d at pp. 850-851].)

Justices Douglas and Marshall dissented on the ground that the act violated the Fourth Amendment. Justice Brennan also filed a dissent,

stating that the record-keeping and reporting requirements of the act constituted an impermissibly broad grant of power to the Secretary.

In view of these varying opinions, whether the seizure involved in the present case would withstand a constitutional challenge in the United States Supreme Court by a bank depositor on Fourth Amendment grounds is unresolved.[3] Indeed, the only federal case decided after *Shultz* and directly confronting the issue of the depositor's rights is entirely consistent with the views we have set forth above. (*United States* v. *Miller, supra,* 500 F.2d 751.) *Miller* holds that *Shultz* may not be interpreted as "proclaiming open season on personal bank records" or as permitting the government to circumvent the Fourth Amendment by first requiring banks to copy their depositors' checks and then calling upon the banks to allow inspection of those copies without appropriate legal process.

The underlying dilemma in this and related cases is that the bank, a detached and disinterested entity, relinquished the records voluntarily. But that circumstance should not be crucial. For all practical purposes, the disclosure by individuals or business firms of their financial affairs to a bank is not entirely volitional, since it is impossible to participate in the economic life of contemporary society without maintaining a bank account. In the course of such dealings, a depositor reveals many aspects of his personal affairs, opinions, habits and associations. Indeed, the totality of bank records provides a virtual current biography. While we are concerned in the present case only with bank statements, the logical extension of the contention that the bank's ownership of records permits free access to them by any police officer extends far beyond such statements to checks, savings, bonds, loan applications, loan guarantees, and all papers which the customer has supplied to the bank to facilitate the conduct of his financial affairs upon the reasonable assumption that the information would remain confidential. To permit a police officer access to these records merely upon his request, without any judicial control as to relevancy or other traditional requirements of legal process, and to allow the evidence to be used in any subsequent criminal prosecution against a defendant, opens the door to a vast and unlimited range of very real abuses of police power.

Cases are legion that condemn violent searches and invasions of an individual's right to the privacy of his dwelling. The imposition upon

---

[3]The majority opinion in *Shultz* contains a statement to the effect that a summons directed to a third-party bank is not a violation of the Fourth Amendment rights of either the bank or the person under investigation by the authorities. (416 U.S. at p. 53 [39 L.Ed.2d at p. 835].) Of course here we have no summons or other court process.

privacy, although perhaps not so dramatic, may be equally devastating when other methods are employed. Development of photocopying machines, electronic computers and other sophisticated instruments have accelerated the ability of government to intrude into areas which a person normally chooses to exclude from prying eyes and inquisitive minds. Consequently judicial interpretations of the reach of the constitutional protection of individual privacy must keep pace with the perils created by these new devices.[4]

### III

We next determine whether the search of petitioner's office and car on December 29 were reasonable. (Cal. Const., art. I, § 13.) Petitioner asserts, inter alia, that the warrant was insufficient on its face because it was based upon hearsay evidence and that the manner in which the entry was effected and the search conducted were illegal. We need not discuss these contentions since we conclude that the warrant, as interpreted and executed by Davis and the officers, was invalid because it was so broad that it authorized a general search of petitioner's offices and because Davis' testimony in support of the warrant justified the issuance of a warrant authorizing a search only for financial records relating to the persons involved in the Miller transaction.

As we have seen, the warrant authorized the search of petitioner's office for records, bank statements and other documents relating to the receipt and disbursement of money and any papers referring to the persons named in the warrant. Davis testified at the suppression hearing that he interpreted this direction in the disjunctive, so that, in his view, it authorized the seizure of papers relating not only to the persons named in the warrant, but also any financial records of petitioner, without regard to the persons with whom the transactions had occurred or the date thereof. Indeed, he stated, he had drafted the warrant, and had deliberately employed language authorizing the seizure of all of petitioner's financial records from the time he began the practice of law.[5] He

---

[4]Back in 1890, Samuel Warren and Louis Brandeis, in their celebrated article, *The Right to Privacy* (4 Harv.L.Rev. 193, 195) foresaw this problem. They wrote: "Recent inventions and business methods call attention to the next step which must be taken for the protection of the person, and for securing to the individual what Judge Cooley calls the right 'to be let alone.' Instantaneous photographs and newspaper enterprise have invaded the sacred precincts of private and domestic life; and numerous mechanical devices threaten to make good the prediction that 'what is whispered in the closet shall be proclaimed from the house-tops.' " (Fn. omitted.)

[5]Davis stated he interpreted the warrant as permitting a search for any of petitioner's financial records from the time he began the practice of law, but conceded that a search of such magnitude would be unduly burdensome and should be confined to the period from 1968 or 1969 onward. Davis did not know when petitioner commenced the representation of Miller in the child support matter.

explained that such broad authorization was necessary to trace the flow of funds through petitioner's various accounts since it was his experience that embezzlers frequently transferred funds between accounts in order to conceal defalcations. The magistrate who issued the warrant testified that he did not intend to authorize the seizure of records which did not refer to the persons named in the affidavit, and that he would have refused to sign a warrant permitting a search of all of petitioner's financial records.

■ Both the Fourth Amendment to the United States Constitution and section 13 of article I of our state Constitution require that a warrant must particularly describe the place to be searched and the things to be seized. The requirement of particularity is designed to prevent general exploratory searches which unreasonably interfere with a person's right to privacy. (*Marron* v. *United States* (1927) 275 U.S. 192, 196 [72 L.Ed. 231, 237, 48 S.Ct. 74].) ■ The Penal Code demands reasonable particularity (Pen. Code, § 1529), and this requirement is held to be satisfied if the warrant imposes a meaningful restriction upon the objects to be seized. (*People* v. *Tenney* (1972) 25 Cal.App.3d 16, 22 [101 Cal.Rptr. 419]; *People* v. *Alvarado* (1967) 255 Cal.App.2d 285, 291 [62 Cal.Rptr. 891]; *People* v. *Barthel* (1965) 231 Cal.App.2d 827, 832 [42 Cal.Rptr. 290].)

In the implementation of these principles, the following descriptions of property have been held to be constitutionally intolerable: a listing of numerous documents by general categories, such as " '[c]hecks, check stubs . . . and bank statements' " followed by " '[a]ny and all other records and paraphernalia connected with' " the business of the suspect (*Aday* v. *Superior Court* (1961) 55 Cal.2d 789, 793-796 [13 Cal.Rptr. 415, 362 P.2d 47]); " 'personal goods and property, to wit, certain paraphernalia.' "(*People* v. *Mayen* (1922) 188 Cal. 237, 242 [205 P. 435, 24 A.L.R. 1383].) "Evidences of indebtedness" of the suspect, his telephone bills, and "[a]ny papers showing names and addresses" of his associates (*Griffin* v. *Superior Court* (1972) 26 Cal.App.3d 672, 692-696 [103 Cal.Rptr. 379]). In *Lockridge* v. *Superior Court* (1969) 275 Cal.App.2d 612, 625-626 [80 Cal.Rptr. 223], a warrant which failed to refer to specific items stolen from a jewelry store was held to be invalid for lack of particularity.

■ It is manifest that the warrant in the present case does not meet constitutional standards of specificity; it permitted the seizure of all of petitioner's financial records without regard to the persons with whom

the transactions had occurred or the date of transactions. (Cf. *People* v. *Berger* (1955) *supra*, 44 Cal.2d 459, 461.)[6]

An equally important reason for holding the search of petitioner's office illegal is that the affidavit in support of the warrant was insufficient to justify a search of any of petitioner's records except those relating to the persons named in the affidavit. It is axiomatic that a warrant may not authorize a search broader than the facts supporting its issuance. (See *Veeder* v. *United States* (1918) 252 F. 414, 418.) The testimony of Davis in support of the warrant related only to petitioner's alleged misconduct with regard to the payments made by Miller; Davis did not relate any facts supporting the issuance of a warrant authorizing an unlimited search for and seizure of all of petitioner's records of the receipt or disbursement of money, even assuming arguendo that a warrant containing such broad language would be valid.

At oral argument the People suggested for the first time that the seizure of the records relating to the persons named in the warrant was justified because the language of the warrant was severable, that even if we hold invalid the portion of the warrant which directs the seizure of all records pertaining to receipt and disbursement of money, we should uphold the search for the documents relating to the Millers. Reliance is placed upon *Aday* v. *Superior Court, supra*, 55 Cal.2d 789, 796-797.

Assuming arguendo that the warrant is severable, the direction to seize "any file or documents" relating to the Millers is too broad to comport with constitutional requirements. The information upon which the warrant was based justified a search of petitioner's files only for financial records relevant to the Miller transaction. The phrase "any file or documents," particularly in a domestic relations context, could well include material of a highly personal nature confided by Miller to

---

[6]The People assert that the broad authorization of the warrant was justified because the circumstances rendered exact description impossible. (Citing *United States* v. *Scharfman* (2d Cir. 1971) 448 F.2d 1352.) That is, they argue, petitioner might have concealed the misappropriation of the Miller checks by depositing them in various accounts, and thus it was impossible to specify in the warrant which particular financial records should be seized. This argument is patently unmeritorious. The People do not suggest how records of extraneous financial transactions which may have occurred several years prior to the alleged misappropriations could have any relevance to the crime, yet the warrant contained no limitation as to the date of the records which could be seized thereunder.

petitioner or revealed by petitioner's own investigation of the Millers' background. Moreover, as pointed out by amicus curiae, the Los Angeles County Bar Association, the lawyer-client privilege protects confidential communications between an attorney and his client (Evid. Code, § 954), and the privilege was clearly violated by the failure of the warrant to limit the search to material relevant to the charge of misappropriation.

Thus, the trial court erred in refusing to grant petitioner's motion to suppress the evidence seized in the search of his office on December 29.

Finally, we consider the validity of the search of petitioner's automobile. As we have seen, the warrant did not authorize the search of the car, but the trial court found that petitioner had consented to the search. One of the officers testified that some check stubs had been found in the office, but that the corresponding checks could not be located. He asked petitioner's permission to search through his car, and petitioner said, "Go ahead . . . be my guest . . . ." Petitioner denied having given the officer permission to search the car. In any event, the officer searched the car and removed a checkbook which was taken with the other papers seized from petitioner's office.

We must, of course, resolve any conflicts in the evidence in favor of the trial court's determination that petitioner in fact gave the officer permission to search his automobile. ■ However, this does not determine whether the search was lawful since we must further ascertain whether petitioner's consent was given voluntarily or was induced by the illegal search of his office. The rule is clearly established that consent induced by an illegal search or arrest is not voluntary, and that if the accused consents immediately following an illegal entry or search, his assent is not voluntary because it is inseparable from the unlawful conduct of the officers. (E.g., *People* v. *Lawler* (1973) 9 Cal.3d 156, 163-165 [107 Cal.Rptr. 13, 507 P.2d 621]; *Kaplan* v. *Superior Court* (1971) 6 Cal.3d 150, 155 [98 Cal.Rptr. 649, 491 P.2d 1]; *People* v. *Johnson* (1968) 68 Cal.2d 629, 632-634 [68 Cal.Rptr. 441, 440 P.2d 921]; *People* v. *Haven* (1963) 59 Cal.2d 713, 719 [31 Cal.Rptr. 47, 381 P.2d 927].) In *Lawler* this principle was applied to vitiate a consent which immediately followed an illegal pat-down search. Here petitioner's assent to the search of his car was the product of the unlawful search of his office; thus the trial court erred in failing to grant the motion to suppress the evidence taken from his car.

Let a peremptory writ of mandate issue directing the respondent court to suppress the evidence obtained as a result of the search of petitioner's office and automobile on December 29, 1971, as well as the evidence obtained from the banks in violation of the views expressed herein.

Wright, C. J., McComb, J., Tobriner, J., Sullivan, J., Clark, J., and Burke, J.,* concurred.

The petition of the real party in interest for a rehearing was denied March 12, 1975, and the opinion was modified to read as printed above. Clark, J., was of the opinion that the petition should be granted.

---

*Retired Associate Justice of the Supreme Court sitting under assignment by the Chairman of the Judicial Council.