[No. AO16402. First Dist., Div. Three. May 31, 1983.]

THE PEOPLE, Plaintiff and Respondent, v.
LARRY EDWARD LOWERY, Defendant and Appellant.

**[Opinion certified for partial publication.*]**

---

*The opinion is certified for publication as modified with the exceptions of issues six through eleven, inclusive. See *post,* footnote 1.

**COUNSEL**

Maurice Moyal, Paul M. Sluis and Moyal & Hyde for Defendant and Appellant.

George Deukmejian, Attorney General, Robert H. Philibosian, Chief Assistant Attorney General, William D. Stein, Assistant Attorney General,

Robert R. Granucci and Michael Buzzell, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**WHITE, P. J.**—This is an appeal by defendant Larry Lowery from his conviction on November 2, 1981, of Penal Code section 496 (receiving and concealing stolen property), for which he was sentenced to two years in state prison.

We affirm the conviction, which appellant challenges on the following grounds: (1) That the search warrant was overbroad, that its scope was exceeded and that it improperly authorized a nighttime search; (2) that the discovery order was violated by the surprise introduction of statements regarding a "theft report"; (3) that evidence of a witness' prior criminal history was improperly admitted; (4) that jury instructions, CALJIC Nos. 17.01 and 2.03, were improperly given; (5) that the mid-trial motion for "change of venue" should have been granted; and (6) that certain documents admitted into evidence were improperly authenticated.

Appellant also included in his brief arguments that the trial court erred in denying bail and stay of execution pending appeal. The appropriate procedure for challenging these decisions is by writ of habeas corpus or an application for bail pending appeal under rule 32(b) of the California Rules of Court. To include them in the brief on appeal is pointless, since they will be mooted whether the conviction is affirmed or reversed. We have therefore given no consideration to these arguments.

Each of appellant's other contentions is discussed below.[1]

*Statement of Facts*

Appellant owned a business called Brut Electronics, which was a business which bought and sold electronic components.

Synertek is a company which manufactures computer chips, also known as integrated circuits (ICs), in Santa Clara. The manufacturing procedure is relatively complex and is described in some detail in respondent's brief. For

---

[1] Discussion of issues relating to violation of the discovery order; admission of certain evidence; jury instructions; denial of motion for change of venue; and authentication of handwriting on documents admitted into evidence is not published.

our purposes the significant facts about the production of ICs at Synertek are these: after the basic device is manufactured, it is shipped overseas and packaged, and then returned to Synertek where it is tested. After the final testing and before marketing, the device is marked with the Synertek logo and with coded numbers which identify the exact type of IC it is and when it was manufactured. Synertek does not sell defective ICs or ICs without these markings.

One type of IC manufactured by Synertek is known as a 2716 EPROM, an IC with an erasable-programmable read-only memory which contains 16,000 memory locations. Synertek's identification number for these ICs is 2041, and each series produced is designated by a letter, with inverse alphabetical sequence indicating the chronological order of manufacture. A particular IC of this type, therefore, could be marked "2041Y 2716 EPROM."

According to testimony from the person who was the security and safety manager at Synertek during the relevant time period, the company discovered losses occurring in 1980 of various lots of ICs from its building which contained parts designated as scrap as a result of the testing process, including defective 2716 EPROMs. These losses from the inventory included one lot of 10,000 2716s, and one lot of 405 "bulls-eye" type 2716s.

Paul Winkler was the president of Memory Electronics, Inc., in Santa Clara, during the relevant time period. He was familiar with appellant and his business, having purchased electronic parts from him in the past. Both Winkler and appellant were "brokers," or independent distributors, in the electronic components industry; they bought parts from manufacturers or other brokers, and sold them either to brokers or to "original equipment manufacturers," i.e., companies which assembled final products such as video games and stereo equipment for the consumer market.

Sometime before April 4, 1980, Winkler spoke with appellant about the availability of 2716s for sale by appellant. Appellant told Winkler that he had 10,000 2716s available and that they would need to be tested because he expected them to have a higher rate of defective parts than normal.

Winkler referred appellant to Marty Lyon whose business included testing integrated circuits for "brokers." Lyon tested the lot of approximately 10,000 Synertek 2716s brought to him by appellant and found a failure rate of about 30 percent. This was a very high failure rate for new ICs, but would not be unusual for used parts or parts that had been discarded by the manufacturer. Also this lot was by far the largest quantity of unmarked parts Lyon had seen in 20 years.

In approximately March 1980, Winkler contacted Bill Checkon of a company called Western Microtechnology and offered to sell him 2716s for $15 each. Because he believed that the current manufacturer's price for 2716s was $24 each, Checkon became suspicious and contacted the police on April 4, 1980.

On April 7, 1980, Checkon, acting in cooperation with the police, bought 100 2716s from Winkler for $15 each.

On April 15, 1980, Winkler's offices were put under police surveillance, and at about 1:15 p.m., an officer observed appellant drive up and carry boxes into the offices. Tubes containing ICs protruded from the boxes appellant was carrying. Winkler and appellant were subsequently arrested. The police seized some of the 2716s found in Winkler's office.

At approximately 6:25 p.m. on April 15, 1980, the product line manager for Synertek examined some of the ICs seized at Winkler's office and told the police that they were Synertek products.

Based essentially on the facts summarized in the preceding four paragraphs, plus other information relating to ICs in the possession of appellant when he was arrested, the police obtained a search warrant which authorized a day or night search of Brut Electronics, appellant's place of business. The warrant authorized a search for: Synertek "2716" integrated circuits, described in physical detail, including markings and code number; Intel "2716s," also described by identifying detail; a marking machine described by identifying characteristics; plates used in the marking machine, described by identifying characteristics, and particularly plates with the Intel and Synertek logos, also described; and business records showing "the possession of or sale of '2716' integrated circuits."

The warrant described the 2716s to be seized as follows: "1. Synertek '2716' integrated circuits further described as rectangular objects approximately 1-1/4" by 3/4", having 24 gold colored pins extending downward from the face and having on the face a gold colored square plate with a transparent insert in the center through which a small silver colored object is visible, and further bearing the word 'Singapore' and the numbers '2041.'

"2. Intel '2716s' further described as brownish rectangular objects, approximately 1-1/2" in length and 1/2" in width, having 24 silver colored pins facing downward from the face and on the face a translucent rectangle. On the opposite side of the rectangle the word Malasia or Philippines and a four-digit number beginning in 79 or 80 will appear."

Police searched Brut Electronics during the night of April 15, 1980, and found a number of items, including a box containing about 972 2716s with Synertek's numbering and logo on them, and a group of aluminum tubes containing 404 Synertek "bulls-eye" 2716s. Other items seized will be described as they are relevant to the discussion in the body of the opinion.

*Discussion*

1. *Whether the Warrant Was Sufficiently Specific With Regard to the Chips.*

■ Appellant argues that the chips to be seized were not described with sufficient particularity. (See generally, Witkin, Cal. Evidence (2d ed. 1966 and 1977 supp.) § 131, and cases cited therein.) He argues that the affidavit in support of the search warrant indicated that the police had the means of distinguishing legitimate from stolen circuits and cites to the record in support of this proposition. The portions of the record to which he refers, however, consist of passages in his own points and authorities filed in support of a motion for return of property and to suppress evidence. These passages reveal that before the date of the search, undercover police had taken chips obtained from another suspect (Winkler), some of which had been supplied to the suspect by appellant, to company experts at Synertek and Intel who had identified the chips after close examination, noticed irregularities, and concluded that they had been stolen. The record does not make it clear that police agents, at the time they were on the premises of Brut Electronics, could have distinguished between stolen and legitimate 2716s. The chips which were the subject of the search, i.e., Intel and Synertek 2716s, were described in considerable detail (see statement of facts, *ante*) and the warrant was sufficiently specific with regard to them.

2. *Whether the Warrant Was Sufficiently Specific With Regard to Business Records.*

Appellant makes a similar argument with regard to the warrant's authorization of the search for business records relating to the sale or possession of 2716s. To the extent his complaint is based on the idea that only business records relating to stolen 2716s should have been included, it must be rejected for essentially the same reasons as his argument about the chips themselves. (See discussion of first issue, *ante*.)

Appellant argues, in addition, that the warrant to search for records was overbroad because it did not set a limit on the time period for which records could be seized, citing *Burrows v. Superior Court* (1974) 13 Cal.3d 238 [118 Cal.Rptr. 166, 529 P.2d 590]. In *Burrows,* the defendant was an attorney accused of misappropriating client funds during a particular six-

month period of time when the client was paying child support payments through the attorney. The search warrant did not specify the time period for which records could be seized, and the police took records for a period of two and a half years before the period in question. (*Id.*, at p. 241.) The warrant was held overbroad "as [it was] interpreted and executed" (*id.*, at p. 248), for this and other reasons. In the instant case, however, the suspected illegal activity was not limited to a specific time period and the warrant to search for records relating to possession and sale of 2716s was not overbroad.

3. *Whether the Scope of the Warrant Was Exceeded by Seizure of Unmarked Chips.*

■ Appellant argues that seizure of *unmarked* integrated circuits exceeded the scope of the search warrant because the warrant described *marked* Intel and Synertek circuits only.

It is well established that items not particularly described in a search warrant may be seized if there is a "nexus" between them and the suspected criminal behavior, so that the scope of the search is "circumscribed by the reasons which justified its inception." (*People* v. *Hill* (1974) 12 Cal.3d 731, 762 [117 Cal.Rptr. 393, 528 P.2d 1]; see also *Skelton* v. *Superior Court* (1969) 1 Cal.3d 144, 158-159 [81 Cal.Rptr. 613, 460 P.2d 485].)

In the instant case, the supporting affidavits indicated that some integrated circuits among those in appellant's possession when he was arrested were unmarked, and items named in the warrant included a marking machine and plates. There is a perfectly clear connection between the unmarked ICs and the materials specifically authorized to be seized.

Appellant also complains of the seizure of certain "2114" integrated circuits, arguing that the seizure of these indicates the lack of specificity of the warrant, since the supporting affidavit did not indicate that defendant was even suspected of dealing in stolen 2114s. It seems clear that the seizure of these ICs, which indeed was not authorized by the warrant either specifically or under the "nexus" test, was a mistake on the part of the police. The 2114s were returned to appellant, and there was no attempt to introduce them into evidence. No harm to appellant resulted from this technical violation, and it is clear that it could not have resulted from any lack of specificity of the warrant itself.

4. *Whether the Scope of the Warrant Was Exceeded by Seizure of Documents Not Relating to 2716s.*

Appellant lists in his brief the numbers of the exhibits listed in the reporter's transcript which were business records and papers of various kinds

and states, "Few of them specify that they relate to any particular type of integrated circuit."

This bald statement is insufficient to establish that any or all of these papers were improperly seized. Appellant's counsel should have been specific as to his objections rather than leaving to the court the task of reviewing the list in detail. At the very least, he should have specified which items were objectionable, where in the record they were described in detail, and the grounds for the objection as to each. (See Cal. Rules of Court, rule 15(a).)

This court examined the record with regard to these exhibits and is satisfied that all of the materials listed either include an explicit reference to 2716s or have a reasonable connection to the crime charged, as business records which could relate to dealing in stolen integrated circuits. We find no abuse of discretion in the admission of any of these exhibits.

5. *Whether the Authorization of a Nighttime Search Was Improper.*

■ Appellant argues that since the office of Brut Electronics was under police surveillance, there was not good cause shown for authorization of a nighttime search under Penal Code section 1533.

Penal Code section 1533 allows a magistrate discretion to authorize a search for any time of the day or night "[u]pon a showing of good cause."

The affidavit in support of the search warrant included the information that appellant had been arrested shortly after 1:30 p.m., the affidavit was made at about 7 p.m., and the warrant would not be completed until approximately 10 p.m. The affidavit requested authorization of a nighttime search to prevent destruction of evidence and to avoid the necessity of maintaining a surveillance until 7 a.m., when no special authorization would be needed for service of the warrant.

The most important items included in this warrant were the integrated circuits, which the affidavit mentioned were "small in size and easily disposed of. . . ." These were objects which could also have been easily concealed. The suspect had been arrested hours earlier and presumably released on bail. Police officers had been deployed to keep the office, as well as appellant's home, under surveillance. Under these circumstances, it was eminently reasonable to authorize a nighttime search of the office.

Contrary to appellant's contention that the police requested a nighttime search warrant to avoid the "inconvenience" of maintaining a surveillance,

the affidavit actually mentions avoiding the "necessity" of an all night vigil. The magistrate may reasonably have concluded, as did the court in *People v. Flores* (1979) 100 Cal.App.3d 221 [160 Cal.Rptr. 839], that the possibility of confrontation with accomplices should be eliminated by ending police surveillance. In any case where, as here, the premises to be searched are a business rather than a residence, a valid consideration is the wisdom of using police resources in an all night vigil when they could be deployed elsewhere.

This is not a question of convenience to the police, but acknowledges the interest of the entire community in efficient use of police personnel. *People v. Watson* (1977) 75 Cal.App.3d 592 [142 Cal.Rptr. 245], relied on by appellant, is inapposite. That case involved a nighttime search of a residence, and the court rightly focused on "the fundamental premise that a search of a person's home is a drastic intrusion upon the personal rights of the homeowner." (*Id.*, at p. 595.)

In the instant case, there was good cause shown for authorization of a nighttime search of appellant's office, and the magistrate's exercise of his discretion was proper.

6.-11.*

. . . . . . . . . . . . . . . . . . . . . . . .

### Conclusion

All of appellant's contentions on appeal have been considered. The record either supports the trial court's decision on each issue or reveals harmless error. The conviction is affirmed.

Scott, J., and Feinberg, J., concurred.

---

*See footnote 1, *ante,* page 902.