[No. B001959. Second Dist., Div. Five. Aug. 29, 1984.]

THE PEOPLE, Plaintiff and Respondent, v.
BRYAN LEE NECE, Defendant and Appellant.

**COUNSEL**

Stilz, Boyd, Levine & Handzlik and Jan Lawrence Handzlik for Defendant and Appellant.

John K. Van de Kamp, Attorney General, Gary R. Hahn and John R. Gorey, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**STEPHENS, Acting P. J.**—On October 7, 1982, Bryan Lee Nece (hereinafter appellant) and two other persons were charged in an information with the commission of certain felonious conduct. Count I charged conspiracy to commit grand theft and conspiracy to cheat and defraud (Pen. Code, § 182, subds. 1 and 4). Counts II and III charged Nece and others with grand theft (Pen. Code, § 487, subd. 1), and in addition, that the value of the property stolen was in excess of $100,000 (Pen. Code, § 12022.6, subd. (b)). Appellant pleaded not guilty to all charges.

On December 21, 1982, appellant had his motion to suppress evidence of his personal finances heard in the superior court. The court denied the motion. Later the denied motion was tested by a writ of mandate filed with this court. Said petition was also denied.

On July 26, 1983, appellant withdrew his not guilty plea as to count II, and instead, entered a plea of nolo contendere. At the same time, on the prosecution's motion, the court dismissed the remaining counts against appellant. At the sentencing hearing on October 21, 1983, the court denied probation and sentenced appellant to state prison for the midterm of two years. This appeal followed shortly thereafter.

### FACTS

The grand theft charge against appellant arose out of an unauthorized transfer of funds by Mr. Nece from the bank account of his employer, Baker Commodities, Inc. These funds were then transferred to his bank accounts at the Atlantic-Whittier branch of Bank of America.

A company specializing in the manufacture and sales of animal and vegetable products, Baker Commodities, Inc., purchased and sold commodities on the commodities and world markets. Appellant handled the cash management of the company and had the responsibility of tracking the company's cash status. If the company had surplus cash, appellant became responsible for investing same. If the company was in need of cash, appellant arranged for the company to borrow it.

In addition to the above responsibilities, appellant was entrusted "to match up purchase orders and contracts with requests for checks," and in some instances, to notify his employer's bank (Bank of America) to whom the funds should be sent, to expedite a waiting customer's acquisition of funds.

On December 30, 1981, appellant opened both a personal checking account and a checking account in the name of Universal Investments (hereinafter Universal) at the Atlantic-Whittier branch of Bank of America.

On April 1, 1982, appellant "wire transferred" some $250,016.13 from a Baker Commodities, Inc. (hereinafter Baker) account into his Universal account. The following day, April 2, 1982, appellant transferred an additional $554,986 from the Baker account into the Universal account.

Appellant issued several checks from the Universal account, dated April 2, 1982, to Ronald Robbins. These checks totalled $98,000 and were deposited in different branches of Bank of America. Appellant also issued $87,000 worth of checks on the Universal account to Oscar Escobar.[1]

In addition to the multitude of transactions occurring on April 2, 1982, appellant "wire transferred" $40,000 from his Universal account to Chase Manhattan Bank in New York. The funds went to the account of First National Mortgage Corporation for the purchase of 100 Krugerrands. A balance of $2,575 remained in the Universal account after all transactions.

On April 2, 1982, an administrator of the Atlantic-Whittier Bank of America, familiar with the Baker account, noticed the aforementioned transactions and found them "unusual." Her suspicions of fraud aroused, the officer placed stop orders and holds on some of the withdrawals and notified the Slauson-Pacific Bank of America, where Baker Commodities, Inc. maintained its account. Moreover, the bank officer, Mrs. Hurst, requested a credit rating on Baker Commodities, Inc. which led to a reciprocal check on the Universal Investments' rating and a disclosure that appellant was the only signatory on the account.

The latter information was made available to Ray Kelley at Baker Commodities, Inc. This led to a search of the trash near appellant's work desk disclosing numerous writings indicative of appellant's responsibility for the fund transfers.[2] Thereafter, corporate counsel for Baker Commodities, Inc. suspected that embezzlement was involved and on April 5, 1982, brought the matter to the attention of the Vernon Police Department.

On April 5, 1982, Detective Stolan of the Vernon Police Department began investigating the matter by meeting with respresentatives from Baker

---

[1]Ronald Robbins and Oscar Escobar were codefendants below, but are not parties to this appeal.

[2]The paperwork included forged, bogus, and altered documents signed by appellant for use in a transfer of funds from Baker Commodities, Inc. Also found was a torn-up check stub relating to one of the fraudulent transfers and a handwritten draft of a letter prepared by appellant.

Commodities, Inc. Among other things, Detective Stolan was shown the documents found in appellant's trash and the banking records of Baker Commodities, Inc. Later that day Baker representatives requested that Detective Stolan meet with them and bank officials at the Slauson-Pacific branch of the Bank of America. At this time he was informed by an officer at the Slauson-Pacific branch of the bank, that the transactions from the Baker account were fraudulent. Eventually, at the direction of Slauson-Pacific officials, the detective went to the Atlantic-Whittier branch to speak with Mrs. Hurst.

Mrs. Hurst provided Detective Stolan, sans search warrant or subpoena, with information on both the Universal account and appellant's personal checking account. The information included photocopies of documents regarding the activities in the Universal account. Some 10 days later, detective Stolan executed a search warrant of 14 branches of Bank of America and seized various documents pursuant to same.

## DISCUSSION

Appellant's sole argument concerns the propriety of the trial court's unfavorable ruling on his Penal Code section 1538.5 motion to suppress. Thus, the sole issue becomes whether appellant's banking records and other financial information were lawfully obtained by the Vernon Police Department from the Bank of America. We find that they were, and affirm the judgment accordingly.

In *Burrows* v. *Superior Court* (1974) 13 Cal.3d 238 [118 Cal.Rptr. 166, 529 P.2d 590], our Supreme Court ruled that pursuant to article I, section 1 of the California Constitution,[3] an individual in California has a reasonable expectation that information he divulges to his bank or the information he allows said institution to compile, in connection with his banking activities, is *confidential.* In so doing, the court also indicated that the police could not lawfully acquire or use said information absent some form of consensual authorization by the individual or legal process, i.e., a warrant, subpoena, or summons; or given a situation in which the bank finds itself a victim of wrongdoing allegedly attributable to the individual customer.

In 1976, as a response to *Burrows'* decision, our Legislature enacted the California Right to Financial Privacy Act (hereinafter Act).[4] A portion of

---

[3]Article I, section 1 of the California Constitution states: "All people are by nature free and independent and have inalienable rights. Among these are enjoying and defending life and liberty, acquiring, possessing, and protecting property, and pursuing and obtaining safety, happiness, and privacy."

[4]This Act is formally listed as title 1, division 7, chapter 20 of the Government Code. (Added by Stats. 1976, ch. 1320, § 5, p. 5911).

the Act now found in section 7470, subdivision (a) of the Government Code currently restricts governmental access to an individual's banking records absent (1) an authorized disclosure by the individual to the requesting governmental agent; or (2) a validly issued administrative subpoena as summons; or (3) a validly issued search warrant; or (4) a judicially sanctioned subpoena or subpoena duces tecum.

In addition, subdivision (d) of said section specifically permits governmental access to an individual's banking records by making said right of access discretionary and exercisable by the financial institution. The criterion for the institution's decision, should it be inclined to make same, is that it believe itself to be a victim of a crime.[5]

As an obvious complement to the aforesaid section's design to safeguard against unbridled governmental intrusion of an individual's privacy rights,

---

[5]Government Code section 7470 states in its entirety: "(a) Except as provided in Section 7480, no officer, employee, or agent of a state or local agency or department thereof, in connection with a civil or criminal investigation of a customer, whether or not such investigation is being conducted pursuant to formal judicial or administrative proceedings, may request or receive copies of, or the information contained in, the financial records of any customer from a financial institution unless the financial records are described with particularity and are consistent with the scope and requirements of the investigation giving rise to such request and:

"(1) Such customer has authorized disclosure to such officer, employee or agent of such state or local agency or department thereof in accordance with Section 7473; or

"(2) Such financial records are disclosed in response to an administrative subpoena or summons which meets the requirements of Section 7474; or

"(3) Such financial records are disclosed in response to a search warrant which meets the requirements of Section 7475; or

"(4) Such financial records are disclosed in response to a judicial subpoena or subpoena duces tecum which meets the requirements of Section 7476.

"(b) Nothing in this section or in Sections 7473, 7474, 7475, and 7476 shall require a financial institution to inquire or determine that those seeking disclosure have duly complied with the requirements set forth therein, provided only that the customer authorization, administrative subpoena or summons, search warrant, or judicial subpoena or order served on or delivered to a financial institution pursuant to such sections shows compliance on its face.

"(c) The financial institution shall maintain for a period of five years a record of all examinations or disclosures of the financial records of a customer pursuant to this chapter, including the identity of the person examining the financial records, the state or local agency or department thereof which he represents, and a copy of the customer authorization, subpoena, summons or search warrant providing for such examination or disclosure or a copy of the certification received pursuant to subdivision (b) of Section 7480. Any record maintained pursuant to this subdivision shall be available, within five days of request, during normal business hours for review by the customer at the office or branch where the customer's account was located when examined or disclosed. A copy of such record shall be furnished to the customer upon request and payment of the reasonable cost thereof.

"(d) Except as provided in Section 7480, this section is not intended to preclude a state or local law enforcement agency from initiating contact with a financial institution if there is reason to believe that the institution is a victim of a crime. After such contact by a law enforcement agency, if the financial institution believes it is a victim of a crime, it may, in its discretion, disclose relevant financial records pursuant to subdivision (c) of Section 7471."

the Legislature enacted Government Code section 7471. That section forbids a financial institution from supplying banking records of its customer to "an officer, employee, or agent of any state or local agency" where the financial institution knows or has reasonable cause to believe that said information is sought in connection with civil or criminal investigation of that customer. In this section, as in section 7470, subdivision (d), an exception is made where the financial institution suspects that a crime is being or has been committed. Subdivision (c) states: "This section shall not preclude a financial institution, *in its discretion,* from initiating contact with, and thereafter communicating with and disclosing customer financial records to, appropriate state and local agencies concerning suspected violation of any law." (Italics added.)

As we perceive it, the situation presented below falls squarely within the ambit of Government Code section 7471, subdivision (c), if not, section 7470, subdivision (d). It is clear from the language itself[6] and its contextual stature that both statutes are intended to allow the disclosure of normally private information to the police, by a financial institution, when the latter has a genuine reason to suspect that a crime has or is being committed, and/or that it may suffer as a victim thereof.

Without such an exception, a bank aware of facts indicating criminal activity, involving its customers and/or itself, would be forced to stand idly to the side, without any other sensible recourse other than to merely *hint* such activity to the police. Undoubtedly, this would stifle police efficiency and more than likely promote criminal activity.

■ Appellant insists that respecting section 7471, subdivision (c), the subject language limits the exception solely to situations in which the bank, and the bank alone, first contacts the police. In the same regard, he urges that the evidence in this case establishes otherwise. Secondarily, appellant attacks the application of section 7470, subdivision (d) with the complaint that the evidence fails to establish that "the bank" believed itself to be "a victim of a crime." We need only concern ourselves with the first contention.

Contending a noncompliance with section 7471, subdivision (c), appellant seizes upon the words "initiating contact," and in turn suggests that the

---

[6]In determining the intent of a statute, the court first examines the words themselves. (*Palos Verdes Faculty Assn.* v. *Palos Verdes Peninsula Unified Sch. Dist.* (1978) 21 Cal.3d 650, 658 [147 Cal.Rptr. 359, 580 P.2d 1155].)

In addition, said statutory language "must be construed in context, keeping in mind the nature of obvious purpose of the statute . . . ." (*Johnstone* v. *Richardson* (1951) 103 Cal.App.2d 41, 46 [229 P.2d 9]; see also *Palos Verdes Faculty Assn.* v. *Palos Verdes Peninsula Unified Sch. Dist., supra,* 21 Cal.3d at p. 659.)

bank's customer, Baker Commodities, and not the bank was the first party to literally bring the suspected banking "irregularities" to the attention of the police. Unfortunately, although we might concede that said language, when isolated, could be construed as appellant so argues, it remains that a contextual reading of same belies said construction and would have the effect of honoring form over substance.

We think the questioned language deserves an interpretation much less strict than advanced by appellant and that said "looser" interpretation is implicit from the obvious import of the statute. Clearly, as indicated above, the language is merely part of a larger framework designed to forestall random and unwarranted government intrusion into an individual's private affairs. The facts at bench establish that in this case, the inquiry made by the government was anything but "random" or "unwarranted," considering that the police did not initiate contact, but were in fact sought for their assistance by a party with well founded suspicion that it was a victim of criminal activity. Equally significant, Baker Commodities would not have been aware of its victimization, "but for" Bank of America's initial observation. Thus, the bank may be said to have constructively "initiated contact."

From another perspective, it would appear that without Baker Commodities' help, Bank of America could not have been able to ascertain, to within any reasonable degree of probability, that a crime had occurred. The record establishes that only after said precautions were taken, did bank officials, Baker Commodities' officials, and the police all convene to share discoverable and nonconfidential information. This in turn led Bank of America officials to first "offer" appellant's bank records for police examination. Thus, it is reasonably possible to characterize said "offer" as constituting nothing more than an "initiation of contact" by the bank for the purpose of "thereafter communicating with and disclosing customer financial records to, [the police] concerning suspected violation of any law."[7]

Construing the subject statute towards giving it meaning and effect,[8] and finding in this instance more than mere substantial compliance by the police, we must discount appellant's argument.

In determining the government's "search and seizure" of appellant's banking records to have been lawful, pursuant to section 7471, subdivision

---

[7]The fact that Detective Stolan was apparently told by bank officials at the Slauson-Pacific branch to speak with Mrs. Hurst at the Atlantic-Wilshire branch concerning appellant's accounts, indicates an apparently volitional and uncoerced "initiation of contact" by the bank.

[8]See *East Bay Municipal Utility Dist.* v. *Appellate Department* (1979) 23 Cal.3d 839, 843 [153 Cal.Rptr. 597, 591 P.2d 1249].)

(c), said evidence was therefore properly admitted by the lower court. The finding makes any further consideration of appellant's contentions unnecessary.

The judgment is affirmed.

Ashby, J., and Hastings, J., concurred.