[Crim. No. 6499. Fifth Dist. Jan. 24, 1984.]

THE PEOPLE, Plaintiff and Respondent, v.
GERALD E. NOSLER et al., Defendants and Appellants.

**[Opinion certified for partial publication.\*]**

---

*\*Parts I-b, I-c, II and III are not published, as they do not meet the standards for publication contained in rule 976(b), California Rules of Court.

COUNSEL

R. Neil Morse, Morse, Morse & Morse and C. R. Bramblett for Defendants and Appellants.

John K. Van de Kamp, Attorney General, James T. McNally and James Ching, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

GALLAGHER, J.*—An information filed on March 26, 1982, accused defendants, Rodney Owens and Gerald E. Nosler, of violation of Penal Code section 487, subdivision 3 (grand theft animal).[1] Pursuant to section 12022.6 it was further alleged that the value of the animals taken exceeded $25,000.

The court heard jointly defendants' motions to dismiss the information (§ 995) and to suppress (§ 1538.5) on May 17 and 19. The court denied both motions on May 19.

Defendants' jury trial began on May 25. On June 1, 1982, the jury returned its verdict finding defendants guilty of the theft and finding the enhancement to be true. Both defendants filed timely notices of appeal.

FACTS

A cattle auction was held on December 12, 1981, at the Madonna Ranch near Turlock. Both defendants attended the auction, but only Nosler registered as a bidder. Photographs were taken showing both defendants at the

---

*Assigned by the Chairperson of the Judicial Council.

[1]All statutory references are to the Penal Code unless otherwise indicated.

auction. Approximately 3,000 head of cattle were sold that day, Richard Mooney buying 621 of them.

Late that evening three trucks picked up 207 cattle from the Madonna Ranch, the drivers claimed to be hauling for Mooney. In fact, Mooney had not requested the drivers to pick up his cattle. The drivers were Timmy Jones, Lewis McClellan, and William Jones, all independent truckers. The next day, December 13, the drivers unloaded the cattle at Rice Ranch near Alturas. Defendant Nosler had arranged for the cattle to be pastured temporarily at Rice Ranch. After being unloaded, the empty trucks were driven north to Oregon where, on December 15, in response to a police "Be on the Lookout" (BOL), the three drivers were arrested for grand theft.

After discovering the deception, an employee of Madonna Ranch telephoned the Merced County Sheriff's office to report the cattle stolen. Initially Detective Mayer handled the investigation. She issued a BOL on December 14. In the meantime, Detective Eldridge had taken over investigation of the reported theft. Later in the day of December 14 Detective Eldridge issued a more detailed BOL, containing a description of the tractors and the license numbers of the drivers.

The Oregon police arrested the three drivers on the basis of Detective Eldridge's BOL and a conversation with Detective Eldridge. The drivers waived their *Miranda* rights and consented to a search of their trucks. The drivers admitted to picking up the cattle from Madonna Ranch, claiming it was at the behest of defendants Owens and Nosler. On December 16 Detective Eldridge arrived in Oregon and questioned the drivers.

From information developed from the drivers Detective Eldridge contacted Lester Guyse, a credit card fraud investigator at the First Interstate Bank. He requested an original credit card receipt on defendant Owens' Visa card for fuel purchased for the three trucks on December 12 at Lew & Ted's Truck Stop. Guyse at that time refused to give Detective Eldridge the receipt.

On December 21 Detective Eldridge spoke with defendant Owens questioning him about the charge at Lew & Ted's. Later that day Owens reported to the bank and Detective Eldridge that one of his three credit cards on the Visa account was missing. Guyse telephoned Detective Eldridge to relate that the card was reported stolen. The next day Guyse called and attempted to speak with Owens. He was not at home.

On January 5, 1982, Owens returned Guyse's call and reviewed the charges made on the "missing" card during the previous month. Owens

affirmed all charges but the one made at Lew & Ted's. Some of the affirmed charges placed Owens in the Turlock area at the time of the auction. Guyse testified to this conversation at the trial.

Several days after this conversation Guyse sent Detective Eldridge the receipt on the Lew & Ted's charge plus a computer printout and several other receipts that Owens had acknowledged. The Lew & Ted's receipt plus two other acknowledged receipts were accepted into evidence at the trial. The acknowledged receipts were used by an expert for purposes of signature exemplars to be compared with the signature on the disputed receipt.

On December 16, upon his return from Oregon, Detective Eldridge along with a Modoc County Sheriff and a Merced Sheriff went to Defendant Nosler's residence in Alturas. Detective Eldridge gave Nosler his *Miranda* rights and Nosler waived them. Nosler admitted to attending the auction but denied any involvement in the subsequent events.

While the police were talking with Nosler, Del Ray Walker was waiting across the road. Walker had originally been contacted by Owens the night before to ask him to haul a load of cattle. When Owens talked with Walker on the morning of the 16th, Walker agreed to haul the cattle and Owens told him to call Nosler for the destination. Walker called Nosler the morning of the 16th and found out the cattle were to go to Iowa. When Walker showed up that afternoon, Nosler told him to wait as he did not want the cattle loaded until evening. About an hour after the police left, Nosler informed Walker that the papers on the cattle were "messed up" and they could not be loaded at this time. He sent Walker home and asked him to send a bill.

On December 17 the auctioneer, Mooney (the buyer of the cattle), and brand inspectors gathered at the Rice Ranch. The auctioneer and Mooney both visually identified the cattle as those from the auction. The brand inspector sheared the cattle looking for and finding the Madonna Ranch brand.

It also developed at trial that defendant Nosler was in default on several loans, one totaling more than a million dollars.

On appeal the issues are:

I. Whether the trial court erred in denying defendants' motion to suppress and motion to dismiss the information because: a. admission of the credit card slips violated their right to privacy; b. the testimony of Guyse violated their right to counsel; c. the testimony of the truck drivers was received in violation of the *Harvey-Madden* rule.

II. Whether the trial court erroneously instructed the jury by the giving of CALJIC Nos. 2.03, 2.71 and 2.71.7 and by refusing to give defendants' proferred "pinpoint" instruction.

III. Whether the trial court improperly admitted the credit card receipts under the business records exception to the hearsay rule.

DISCUSSION

I.

MOTION TO SUPPRESS

On appeal defendants claim admission of the three credit card slips and the testimony of Guyse violated their rights to privacy and counsel. As these claims were raised below only at the section 1538.5 hearing and not at trial, they will be treated only in the context of the appeal of the trial court's denial of defendants' section 1538.5 motion.

The standard of review on appeal of the denial of a section 1538.5 motion to suppress is dictated by the nature of the proceedings below. "In *People* v. *Lawler* (1973) 9 Cal.3d 156, 160 [107 Cal.Rptr. 13, 507 P.2d 621], we expressed the standard to be applied in appellate review of a section 1538.5 hearing: 'In such a proceeding the power to judge the credibility of witnesses, resolve any conflicts in the testimony, weigh the evidence and draw factual inferences, is vested in the trial court. On appeal all presumptions favor the exercise of that power, and *the trial court's findings on such matters, whether express or implied, must be upheld if they are supported by substantial evidence.* The trial court also has the duty to decide whether, on the facts found, the search was unreasonable within the meaning of the Constitution. . . . Of course, if . . . review is . . . sought, it becomes the ultimate responsibility of the appellate court to measure the facts, *as found by the trier,* against the constitutional standard of reasonableness.' (Italics added.) It follows that section 1538.5 review encompasses a two-step process. We must first determine whether the trial court's findings of fact, implicit or explicit, are supported by substantial evidence. We must then decide whether, in reaching its decision, the trial court properly applied constitutional standards to those facts." (*People* v. *North* (1981) 29 Cal.3d 509, 513 [174 Cal.Rptr. 511, 629 P.2d 19].)

a.

Defendants challenge the admission into evidence of three credit card receipts sent to the police by Guyse as violative of the right to privacy.

In California, a credit card holder has a reasonable expectation of privacy in the issuer's records and such expectation cannot be violated by unreasonable governmental intrusion. (*People* v. *Blair* (1979) 25 Cal.3d 640, 652 [159 Cal.Rptr. 818, 602 P.2d 738]; *Burrows* v. *Superior Court* (1974) 13 Cal.3d 238, 243 [118 Cal.Rptr. 166, 529 P.2d 590]; Gov. Code, § 7460 et seq.) "However, if the bank is not neutral, as for example where it is itself a victim of the defendant's suspected wrongdoing, the depositor's right of privacy will not prevail." (*Burrows, supra,* at p. 245; see too *Blair, supra,* at p. 652; Gov. Code, §§ 7470, subd. (d) and 7471, subd. (c).) Defendants' challenge raises novel questions both as to the nature and scope of the "bank as victim" exception.

Typically, in the criminal cases that have concluded the bank is a victim, the defendant is charged with passing bad checks. (*People* v. *Hole* (1983) 139 Cal.App.3d 431, 438 [188 Cal.Rptr. 693]; *People* v. *Muchmore* (1979) 92 Cal.App.3d 32, 34 [154 Cal.Rptr. 488]; *People* v. *Superior Court (Abrahms)* (1976) 55 Cal.App.3d 759, 770-772 [127 Cal.Rptr. 672].) In the bad check cases the link between the suspected wrongdoing and the "bank as victim" is direct. Here, the link is more tenuous. The bank is not a victim of the defendants' cattle theft. However, the disputed credit card charge directly implicates Owens in the theft and his innocence can only be maintained if he disaffirms making the charge. The initial question is whether a bank which is an indirect victim of the alleged wrongdoing may also claim status as "not neutral" under the exception. We hold that it may.

In *Blair* the Supreme Court held that like bank customers, credit card holders enjoyed a right of privacy in their records. The court in *Blair* rejected a claim that the Diner's Club was a victim. "[The People] claim, first, that Diner's Club was not a neutral party because defendant had obtained the card under an assumed name and therefore the case comes within the exception to the rule referred to in *Burrows.* This reasoning is flawed under the circumstances of the present case. Diner's Club obviously did not view itself as the 'victim' of defendant's conduct: after informing the police regarding one charge on the account, it refused to provide any further information unless compelled to do so by subpoena. It is noteworthy also that a representative of American Express testified at the suppression hearing that the fact a customer obtains a card under a fictitious name would not cause the company to cancel the account. Use of fictitious names is not illegal in California unless employed for a fraudulent purpose or in violation of a statute." (*People* v. *Blair, supra,* 25 Cal.3d at p. 652.)

Unlike the circumstances of the *Blair* case, the bank here might very well have felt itself the victim of a fraudulent disavowal. The disavowal was dictated by the nature of the evidence tying Owens to the theft. Guyse

knew that the authorities sought the one receipt in connection with a criminal investigation. When Guyse spoke with Owens about his "missing" card, the only charge denied by Owens was the one requested by the authorities. The bank can be viewed as a direct victim of Owens' attempt to "cover up" his involvement in the crime.

Like a victim, the bank had a vested interest in the course of the criminal investigation. Under these circumstances it appears reasonable to hold that the defendants' right of privacy cannot prevail over the nonneutral interests of the bank.

Defendants alternatively contend that even if the bank was justified in giving the police the receipt for the disputed transaction, it exceeded the scope of the "bank as victim" exception by sending copies of receipts of nondisputed transactions. After his conversation with Owens on January 5, Guyse sent the investigators a computer printout of recent charges on Owens' card plus several signed receipts. The disputed receipt and two others were admitted into evidence at the preliminary hearing and at trial. The two affirmed receipts were used for purposes of signature comparison.

Neither the *Burrows* nor *Blair* case discussed the scope of what records a "victim" bank may turn over to the authorities. However, in Government Code section 7470 et seq., part of the California Right to Financial Privacy Act, the Legislature codified the "bank as victim" exception. Section 7470, subdivision (d), of the Government Code provides, in part, that "[I]f the financial institution believes it is a victim of a crime, it may, in its discretion, disclose *relevant* financial records . . . ." (Italics added.) Failure to comply with the Act subjects the violator to misdemeanor charges and "[e]vidence obtained in violation of this chapter is inadmissible . . . ." (Gov. Code, § 7489.)

 As the bank decided on its own initiative what materials to turn over to the authorities, the constitutional considerations in *Burrows* and *Blair* would not act to constrain admission of the evidence on constitutional privacy grounds. (*People* v. *North, supra,* 29 Cal.3d 509, 514.) The only pertinent rule which would limit the material revealed by the bank to the authorities would be the relevancy requirement of Government Code section 7470, subdivision (d).

When the three receipts were introduced into evidence, defendants interposed objections as to the relevancy of the receipts. The objections were denied by the court. For evidentiary purposes the other two receipts were highly relevant. They presented "natural" exemplars of defendant Owens' signature which could be compared to the disputed receipt. The authenticity

of the signature on the disputed receipt was highly relevant to the bank's concerns, as well as those of the prosecution.

 This is not to say that "relevancy" under section 7470, subdivision (d), is limited to evidentiary relevancy required by the Evidence Code. (Evid. Code, § 210.) But, whatever the outer limits of the requirement of relevancy might encompass, we hold the inner limits of relevancy for Government Code section 7470, subdivision (d), include relevancy for purposes of admission at trial.

b.*

. . . . . . . . . . . . . . . . . . . . . . . . . . .

c.*

II.

JURY INSTRUCTIONS*

. . . . . . . . . . . . . . . . . . . . . . . . . . .

III.

ADMISSION OF BUSINESS RECORDS*

. . . . . . . . . . . . . . . . . . . . . . . . . . .

DISPOSITION

The judgment is affirmed.

Franson, Acting P. J., and Martin, J., concurred.

A petition for a rehearing was denied February 23, 1984, and appellants' petition for a hearing by the Supreme Court was denied March 22, 1984.

---

*See footnote, *ante,* page 125.