[No. F008575. Fifth Dist. Feb. 18, 1988.]

THE PEOPLE, Plaintiff and Appellant, v.
ANDY JERRY WILLIAMS et al., Defendants and Respondents.

John K. Van de Kamp, Attorney General, Steve White, Chief Assistant Attorney General, Garrett Beaumont and Derald E. Granberg, Deputy Attorneys General, for Plaintiff and Appellant.

Michael Cross, under appointment by the Court of Appeal, and Michael L. Sprague, for Defendants and Respondents.

OPINION

PETTITT, J.*—

*Statement of the Case*

On October 10, 1985, a search warrant was issued for the Bakersfield residence of respondents, Karen Louise Williams and Andy Jerry Williams. This warrant was obtained by the Narcotics Division of the Kern County Sheriff's Department, and it specified the search was to be for cocaine and drug-related paraphernalia only.

As a result of the execution of this search warrant a complaint was filed charging respondents with possession of cocaine for sale, possession of methamphetamine for sale, possession of an automatic weapon, and a fourth count of receiving stolen property.

After a preliminary hearing, the respondents were bound over on the drug and weapon charges. However, the evidence supporting the receiving stolen property charge was suppressed and that count was dismissed.

---

*Retired judge of the superior court sitting under assignment by the Chairperson of the Judicial Council.

Later a complaint charging respondents with receiving stolen property in violation of Penal Code section 496 was refiled. Respondents waived a preliminary hearing on this complaint, and an information, No. 32886, was filed charging respondents with one count of receiving stolen property in violation of section 496 of the Penal Code.

Respondent Andy Jerry Williams filed a motion to dismiss pursuant to Penal Code section 1387, and a motion to suppress evidence pursuant to Penal Code section 1538.5. Respondent Karen Louise Williams joined in those motions.

The motion to dismiss was denied, but the motion to suppress items of stolen property was granted.

The People filed a notice of appeal from the dismissal of the action which occurred because of the prosecutor's inability to proceed after the suppression motion was granted.

### The Facts

This seizure was the result of the execution of a search warrant which targeted narcotics and narcotics paraphernalia only. The search was carried out by five officers of the Narcotics Task Force of the Kern County Sheriff's Department and Officers Hackney and Porter of the Eastside Burglary Detail of the Kern County Sheriff's Department. Because our decision in this case turns on factual matters, a detailed statement of the facts is necessary.

On October 15, 1985, Sergeant Monty True, who was in his second month in charge of the Kern County Sheriff's Department burglary-theft detail, received a call requesting assistance in the execution of a search warrant. It was unclear whether this request came from the narcotics detail or the division commander, but nevertheless Sergeant True was simply asked to supply two bodies to the narcotics detail. He gave this assignment to Officers Hackney and Porter because they were the only officers who were in the office at the time and available for assignment. Usually, when additional manpower was required by the narcotics detail in executing a warrant, normal procedure was to contact the lieutenant in charge of the detective division or, if he was unavailable, to go to one of the sergeants in charge of the various details and ask for "anybody" who might be available.

In any event, Sergeant True was not aware of whether Hackney and Porter had a particular interest in respondents or their residence. He testified that if one of the officers in the detail suspects someone might be a

large dealer in stolen property, the officer will usually communicate that fact to him. He then stated he had no recollection of receiving such information about respondents. However, it is clear Officers Hackney and Porter did have an interest in respondents and their residence.

William L. Hackney, a senior deputy sheriff with 16 years experience, had been assigned to the burglary detail for 3 years as of the suppression hearing in March 1986. He first became aware of respondents sometime between February and April of 1985. He had received several telephone calls from neighbors who reported large amounts of personal property being taken into respondents' residence at all hours of the day and night. Another officer in the Eastside burglary detail, Officer Smithson, also received similar calls. Sometime in April of 1985, after receiving such calls, those two officers drove to respondents' residence at 2304 Flint Drive. Both officers were members of the Eastside burglary detail, and this residence was located in the Eastside area. Once there, the officers knocked on the front door but found no one home. The officers, who had neither a search nor arrest warrant, entered the premises and made contact with a construction worker who was working on the patio roof. This man told the officers that although respondent Andy Williams was not employed, he (Williams) was able to pay for all of the property which was coming in and out of the premises; and, the worker also told the officers, Williams had money to pay him as well. The officers observed a large quantity of hand tools and a compressor in the backyard. When Officer Hackney peered into the house through a sliding glass door, he saw only a few bullets and something "stacked" which he could not identify.

Officer Hackney testified that after this contact with the workman at respondents' residence, the telephone calls from the neighbors ceased. However, the police report he filed stated that for the six to eight months prior to October 15, 1985, he continued to receive information concerning suspicious activities at 2304 Flint Drive. Officer Hackney also testified that during the course of the telephone calls, he formed the opinion respondent Andy Williams was possibly dealing in stolen property from this home. Officer Hackney was aware of rumors going around about an "Eastside fence," and although he formed a suspicion Andy Jerry Williams might be that "fence," he stated he felt he lacked probable cause for a warrant to search the property. Hackney discussed with other officers in the burglary detail this lack of probable cause and his desire to get on the property. He also discussed respondent Andy Jerry Williams with members of the narcotics detail and told them about his feelings that the occupants of the Flint Drive home were fencing stolen property. He testified this exchange of information between the narcotics and burglary details was common procedure. He stated it has been his experience that people who deal in drugs also

deal in stolen property and that they will accept merchandise for narcotics. Finally, he also said it is not uncommon to find stolen property in conjunction with narcotics, and one of the reasons the burglary detail is asked to help serve narcotics search warrants is partially because of their expertise in the area of stolen property.

Craig Porter, a senior deputy sheriff who had been assigned to the burglary detail for two years as of October 15, 1985, also had an interest in respondents and their residence. About May or June of 1985, Porter became aware of respondent Andy Jerry Williams in a stolen property case. The victim told Porter he felt Williams was involved in the theft of his property. Officer Porter contacted Williams at his residence, told him about the case he was investigating, and asked if he could conduct a search of the residence. Williams agreed, and Porter conducted a search of the house. Porter did not find the specific stereo components he was looking for. This occasion was the first time Porter was on respondents' property, and he told Officer Hackney about this investigation and trip to respondents' home.

October 15, 1985, was the day of the search in question, and after Officers Hackney and Porter received their assignments from Sergeant True they proceeded to the narcotics task force offices. It was here, for the first time, the officers learned the location of the search. This was not the first time either officer had assisted the narcotics detail in the execution of a search warrant. Officer Hackney had done it some 10 or 15 times before, and Officer Porter had previously assisted the narcotics detail some 15 or 20 times. Also, within 10 days prior to October 10, 1985, narcotics detail Detective Rudy Gonzales, the affiant for this particular warrant, had contacted Officer Porter and asked for the physical description and date of birth of respondent Andy Jerry Williams. This is information required for all search warrants, and Officer Porter testified he could not explain why Gonzales would have selected him to obtain this particular information concerning respondent Andy Jerry Williams.

Officers Hackney and Porter, along with the narcotics task force, attended a briefing, then proceeded to 2304 Flint Drive. Porter was assigned to enter the front door of the residence with some members of the task force, and Hackney was assigned to enter the backyard and to contain the rear of the residence. Once the entry of the home had been accomplished, Porter was assigned to secure the living room area and to watch the people in the residence as they were brought to him by other officers. After about 15 or 20 minutes, Porter was replaced by a uniformed officer who took over the task of watching the people. Porter then undertook the general assignment he had been given of searching for narcotics and related paraphernalia.

As noted earlier, Hackney had been given the task of entering the backyard and containing the rear of the residence. When he attempted to do so, he encountered a locked gate. As he attempted to go over the fence, he was told that the entry had been made, the residence was secure, and to come to the front door. Once Hackney was inside, Officer Leavelle, the narcotics task force officer in charge of the search, assigned him to search the southwest bedroom. Hackney searched the bedroom and found no narcotics, but did find some paraphernalia. He had been instructed to leave items where they were found and to contact the officer in charge so he could observe the item in place and seize it. Officer Leavelle next instructed Hackney to go to a small room off the kitchen, which Hackney called the "safe" room, to continue looking for narcotics. Hackney again found no narcotics, but again stated he did find some paraphernalia. The safe was open when Officer Porter answered Officer Hackney's call for assistance. They examined the safe for narcotics but found none. What they did find were numerous shotguns, revolvers, and rifles. The officers started removing the firearms and taking note of the serial numbers. According to Officer Porter, at this point the officers were no longer searching for narcotics. As Hackney had approached the safe room, he had noted the den area appeared to be a storage room, and he stated the room contained many items. Officer Porter had also noted the large number of items in the den area.[1]

As they examined the firearms at this time, each officer suspected some, if not all, of the property on the premises was stolen. Each based this opinion on the quantity and nature of the merchandise. Firearms and electronic equipment are among the "hottest" items for the burglary detail. Such items are in high demand and are stolen every day. At this time, the officers decided to run the serial numbers, not only on the guns, but on some of the other personal property present.

When Hackney attempted to run serial numbers through his dispatcher, he was advised that the departmental unit was not functioning. Hackney asked a plainclothes Bakersfield Police Department detective, who was present on the scene, to run some serial numbers through the National Crime Information Center for him. In order to run the serial numbers, it was necessary for the officers to move and/or manipulate the items so as to view the serial numbers. After the numbers were run, the officers were

---

[1] These items included stereo and video equipment, wall clocks, four or five large grandfather clocks, a pool table standing on edge, silverware, belt buckles, and other boxes. In fact, there were video cassette recorders (VCR), television sets, and stereo equipment in every room of the house. One bedroom had three television sets, and the officers stated it was difficult to move about in the den because of the number of items piled in the room. Porter estimated there were from 15 to 25 weapons in the safe. Hackney estimated there were about 30.

advised that several of the items checked came back as stolen. It was learned a VCR and a power unit in the living room came back as stolen. A VCR in the safe area came back as stolen. A VCR in the southeast bedroom came back as stolen, as well as a television set also seized from that bedroom. Some of the firearms were apparently reported stolen as well. Also, Officer Hackney located a clock in the living room with the name "R. Burright" on the back. Hackney telephoned a Mr. Burright, who told the officer the clock had been stolen in a recent burglary. In order to read the name "Burright" on the back of the clock, it was necessary to move the clock. Ultimately, Officer Hackney requested assistance from the burglary division, and they began seizing this property.

Eventually, the detective from the Bakersfield Police Department who had been the link through his dispatcher to the crime information center had to leave.

Officer Porter testified his intent in going to the residence was to search for narcotics. He stated he did not recall thinking about stolen property when he went there. He went there looking for narcotics, and did not expect to find stolen property. Finally, he said he was not aware Hackney had wanted a search warrant for this residence.

Officer Hackney testified that he had no agreement with the narcotics detail that they would try to get a search warrant to get into respondents' residence. Hackney said he did not feel he could use a narcotics search warrant to get into the house to look for stolen property.

At respondents' request, the trial court received in evidence a transcript of part of the testimony given by Deputy Sheriff Edward Leavelle during the preliminary hearing after which respondents were not held to answer on the charge of receiving stolen property. Stipulations for the purpose of standing were also entered to the effect that Andy Williams was the owner and resident of the premises searched, that Karen Louise Williams was his spouse and cotenant, and that both were in the house at the time of the search.

Leavelle testified that he had spent five and one-half years with the narcotics task force. He testified a search warrant for respondents' property at 2304 Flint Drive was issued for execution on October 15, 1985, and that Officers Hackney and Porter were present for the briefing prior to the execution. In addition to Leavelle, there were four other members of the narcotics task force present at this briefing. Leavelle was the officer who was to be in charge of the search warrant execution.

Asked if there was a discussion at the briefing as to why Porter and Hackney were going along, Leavelle replied, "I don't recall if they were going because of suspected stolen property in the house or if they were going because we were short[-]handed." Asked if there was a conversation at that meeting about the fact they expected to run across stolen property, Leavelle replied, "There may have been. I don't recall."

Leavelle also stated it was common for the narcotics detail to call in members of other units to assist in serving search warrants. He said it is done perhaps "once a week," and usually because narcotics is short-handed.

Leavelle acknowledged that as he looked around "I saw a lot of items that appeared to me to be consistent with someone who might be keeping stolen property in the house." Asked why he formed that opinion, Leavelle replied, "Because frequently people that deal drugs take in contraband, stolen contraband, rather than money in exchange for drugs." Asked if there was anything about the positioning, numbers, or nature of the property that added to his opinion, Leavelle replied: "In the den area, the whole house seemed cluttered to me, like there was too much stuff for a house that small. As far as looking at it and saying I think that's stolen, no I didn't do that. It appeared to me that the house had a lot of stuff in there."

Pressed about his suspicion, Leavelle added, "No. That wasn't my mission there to begin with, so I didn't really look at anything to determine if I'd thought it was going to be stolen or not, no." Detective Leavelle testified further that all of the narcotics were exclusively handled by narcotics officers. He also said the narcotics officers had nothing to do with the searching for and/or checking of any allegedly stolen property at respondents' residence. He said the checking of stolen property was exclusively handled by Hackney and Porter.

Defense counsel also posed the question "Was it anyone's mission there to look for stolen property prior to going in there?" Leavelle answered, "[i]f there was somebody there from burglary, probably, that would be their mission, yes."

"Q: Was it discussed at the meeting prior to going into the house whether or not certain people would be designated towards looking for stolen property only?

"A: It's never actually discussed that this person is going to look for stolen property and this person is going to look for drugs. We go in as a unit. Our main concern when we get there is to secure the house as far as people and weapons so that nobody gets hurt. Then we continue with our

search. But nobody is actually designated to look for any certain thing. Normally, if burglary is with us, that's what they are looking for. My mission is drugs; their mission is stolen property."

Appellant contends the trial court incorrectly granted respondents' motion to suppress the evidence of the stolen property "because the search warrant was valid, the execution of the warrant was within constitutional limits, and the examination of the serial numbers was based on probable cause to believe the property was stolen." Appellant also urges reversal of the judgment because: (1) "inadvertence" is not a requirement under California law for a plain view seizure; (2) "[a] search is not pretextual when the warrant was not procured as a subterfuge to search for additional items and the search was of no significantly greater scope and intensity than authorized by the magistrate"; and, (3) the recent United States Supreme Court case of *Arizona v. Hicks* (1987) 480 U.S. 321 [94 L.Ed.2d 347, 107 S.Ct. 1149] was not properly applied by the lower court.

Defendants contend the trial court order suppressing the evidence of stolen property must be affirmed for two primary reasons: First, that the officers from the burglary detail used the narcotics search warrant only as a pretext to gain entry for the purpose of conducting a general exploratory search for stolen property. Second, that the plain view doctrine is inapplicable to the factual situation of this case because Detectives Hackney and Porter did not have probable cause to seize any of the personal property on the premises. On the second contention appellants cited *Arizona v. Hicks, supra,* 480 U.S. 321 [94 L.Ed.2d 347, 107 S.Ct. 1149] and *People v. Murray* (1978) 77 Cal.App.3d 305 [143 Cal.Rptr. 502]. They also contend the order of suppression must be upheld because it is supported by substantial evidence.

The review of a Penal Code section 1538.5 suppression decision is a two-step process: " '. . . We must first determine whether the trial court's findings of fact, implicit or explicit, are supported by substantial evidence. We must then decide whether, in reaching its decision, the trial court properly applied constitutional standards to those facts.' [Citation.]" (*People v. Nosler* (1984) 151 Cal.App.3d 125, 130 [198 Cal.Rptr. 653].)

We agree with appellant and will reverse the judgment dismissing information No. 32886. At the same time we find the court's findings and order granting respondents' motion to suppress evidence seized was in error.

# I

*The Officers Did Not Enter and Search Respondents' Residence on a Pretext*

■ The officers who seized the stolen articles at the residence entered the house under authority of a valid and, indeed, unchallenged search warrant. The only issue as to the entry and presence of Officers Hackney and Porter is whether they accompanied the narcotics officers on a pretext of looking for narcotics when their intent was to gain entrance for the purpose of searching for stolen property.

■ We agree that an officer's entry and search of premises must be in good faith before the plain view doctrine will apply. ■ Here the only possible evidence of lack of good faith is the testimony of Officer Leavelle at the preliminary examination, a transcript of which was received in evidence at the hearing before the trial court. That testimony amounted to no more than a conclusion of the witness based solely upon surmise. He contradicted nothing either Hackney or Porter stated regarding their intention or reason for being a part of the group executing the search warrant. Nor did Officer Leavelle testify either officer did anything which revealed an intention before or at the time of entry that he was acting other than in good faith pursuant to the valid warrant. We note Leavelle gave orders to both officers, which they followed, in regard to securing the premises and searching for narcotics and paraphernalia. It was as a result of these orders that the plethora of electronic equipment, household articles, silverware, clocks and firearms presented themselves in plain view to the officers.

Officers Hackney and Porter were uncontradicted in their testimony that their assignment to accompany the narcotics unit on the warrant execution was completely fortuitous. Neither gave testimony that left even an inference that he entered upon his unrequested assignment with any intent other than to execute the warrant under the direction of the officer in charge. ■ The test in this case is an objective one. (*United States* v. *Leon* (1984) 468 U.S. 897 [82 L.Ed.2d 677, 104 S.Ct. 3405]; *Massachusetts* v. *Sheppard* (1984) 468 U.S. 981 [82 L.Ed.2d 737, 104 S.Ct. 3424].) The *Leon* case involved a deficient affidavit upon which a search warrant was based, and *Sheppard* involved a deficient warrant. In both cases the officer involved had acted in "objectively reasonable" good faith. The United States Supreme Court in *United States* v. *Leon, supra,* at page 907 [82 L.Ed.2d at p. 688], stated: " 'Our cases have consistently recognized that unbending application of the exclusionary sanction to enforce ideals of governmental rectitude would impede unacceptably the truth-finding functions of judge and jury.' " In the instant case, to attempt to impose the harsh

and debilitating sanction of exclusion of massive, inherently trustworthy, tangible evidence of guilt by imposing an amorphous subjective test would likewise be unacceptable. We say "amorphous" because there is no credible evidence that either of the subject officers executed the warrant and search in other than an objectively reasonable manner.

In *Scott* v. *United States* (1978) 436 U.S. 128, 137 [56 L.Ed.2d 168, 177, 98 S.Ct. 1717], the Supreme Court states: "[A]lmost without exception in evaluating alleged violations of the Fourth Amendment the Court has first undertaken an objective assessment of an officer's actions in light of the facts and circumstances then known to him. The language of the Amendment itself proscribes only 'unreasonable' searches and seizures. In *Terry* v. *Ohio,* 392 U.S. 1, 21-22 [20 L.Ed.2d 889, 905-906, 88 S.Ct.1868] (1968), the Court emphasized the objective aspect of the term 'reasonable.' 'And in justifying the particular intrusion the police officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion. The scheme of the Fourth Amendment becomes meaningful only when it is assured that at some point the conduct of those charged with enforcing the laws can be subjected to the more detached, neutral scrutiny of a judge who must evaluate the reasonableness of a particular search or seizure in light of the particular circumstances. And in making that assessment it is imperative that the facts be judged against an objective standard; would the facts available to the officer at the moment of the seizure or the search "warrant a man of reasonable caution in the belief" that the action taken was appropriate?' (Footnotes omitted.)"

▮ Furthermore, the fact an officer may have knowledge of possible criminal activity of the suspect, not necessarily connected with the criminal activity which is the subject of the warrant, should not necessarily impugn the integrity of his search pursuant to a valid warrant. ▮ That is what respondents ask this court to do without any evidence other than an assumption by Officer Leavelle, an assumption which would appear to have probative value only if found to have been an acceptable method of presenting evidence of custom and practice. We are unaware of any authority warranting such a conclusion. Habit and custom are sometimes admissible as evidence of the conduct of a party on a particular occasion or to establish a standard of care,[2] but the testimony of Officer Leavelle made no mention of a habit, custom or practice of Officers Hackney or Porter which might be evidence of what their intent was on the day in question. Indeed, there was no testimony at all bearing on habit or custom which might indicate illegal

---

[2]Evidence Code section 1105; 1 Witkin, California Evidence (3d ed. 1986) section 351, page 321.

conduct by the officers on the specified occasion. ██ We conclude, therefore, that the two officers acted in good faith and not on a pretext. Thus their actions must be judged in the light of accepted plain view criteria and the objective standard as set forth in *Leon, supra,* 468 U.S. 897, and *Sheppard, supra,* 468 U.S. 981.

## II

*There Was No Substantial Evidence the Officers Did Not Have Probable Cause to Search for Stolen Property*

██ Appellant contends the trial court incorrectly granted respondents' motion to suppress the evidence of the stolen property "because the search warrant was valid, the execution of the warrant was within constitutional limits, and the examination of the serial numbers was based on probable cause to believe the property was stolen." Part of the basis of this claim that the suppression order must be reversed is: ". . . the search was of no significantly greater scope and intensity than authorized by the magistrate"; and, the recent United States Supreme Court case of *Arizona* v. *Hicks, supra,* 480 U.S. 321 [94 L.Ed.2d 347, 107 S.Ct. 1149] was not properly applied by the lower court.

Respondents primarily contend that (1) *Arizona* v. *Hicks* was properly applied by the trial court; and (2) *People* v. *Albritton* (1982) 138 Cal.App.3d 79 [187 Cal.Rptr. 652] mandates suppression of the evidence at issue in the instant case.

We first note that the evidence indicates the officers did not move articles to get serial numbers or other indicia of ownership to any greater degree than one might expect in looking for hidden drugs pursuant to the warrant.

Next we conclude the trial court correctly selected *Arizona* v. *Hicks, supra,* 480 U.S. 321 [94 L.Ed.2d 347, 107 S.Ct. 1149], as the dispositive authority. In *Hicks,* the Supreme Court held that the movement of an object to obtain a serial number during a warrantless search is itself a search requiring the police to have probable cause to believe the item is evidence of a crime. (*Id.* at pp. 326-327 [94 L.Ed.2d at p. 355, 107 S.Ct. at pp. 1153-1154].) However, we will reverse the judgment of the trial court because we disagree with its factual determination that Officers Hackney and Porter did not have such probable cause to support the action taken by them. Such a disposition is not contrary to the law governing appellate review of Penal Code section 1538.5 suppression motions, for we must not only decide whether the lower court applied the proper constitutional standard to the facts, but whether the implicit and explicit factual findings made by the

lower court are supported by substantial evidence. (*People* v. *Nosler, supra,* 151 Cal.App.3d 125, 130.)

### A. *Arizona v. Hicks.*

█ The general rule is that when a search is made pursuant to a warrant, the search and seizure are limited by the terms of the warrant. Only the premises described in the warrant may be searched, and only the property described in the warrant may be seized, for "searches conducted outside the judicial process . . . are *per se* unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions." (*Katz* v. *United States* (1967) 389 U.S. 347, 357 [19 L.Ed.2d 576, 585, 88 S.Ct. 507], fn. omitted.) █ In the present case, the property which was seized and which is at issue is property which was not specified in the warrant as a target of the search. In fact, the box on this warrant for "stolen or embezzled property" was left blank. █ However, this alone does not render the search and seizure violative of the Fourth Amendment for the apposite federal rule and exception is as follows: "It has long been settled that [contraband or stolen] objects falling in the plain view of an officer who has a right to be in a position to have that view are subject to seizure and may be introduced in evidence." (*Harris* v. *United States* (1968) 390 U.S. 234, 236 [19 L.Ed.2d 1067, 1069, 88 S.Ct. 992].) █ However, *Arizona* v. *Hicks, supra,* 480 U.S. 321 [94 L.Ed.2d 347, 107 S.Ct. 1149], has limited this "plain view" doctrine in such a way that the instant search and seizure can be challenged. In the instant case, the lower court correctly noted this.

In *Hicks,* the police entered the suspect's apartment after a shooting to search for the suspect, possible victims, and weapons. During the search, one officer noticed two sets of expensive stereo components and suspected they were stolen. He moved some of the components, recorded their serial numbers, and later determined they were stolen. The court held that the mere recording of the serial numbers did not constitute a seizure because in and of itself it did not " 'meaningfully interfere' with [the defendant's] possessory interest" in either the serial numbers or the stereo. (*Arizona* v. *Hicks, supra,* 480 U.S. at p. 324 [94 L.Ed.2d at p. 353, 107 S.Ct. at pp. 1152-1153].) █ However, the court also held that the officer's actions in moving the equipment discovered in plain view to locate serial numbers constituted a "search" which had to be supported by probable cause. (*Id.* at pp. 326-327 [94 L.Ed.2d at p. 355, 107 S.Ct. at pp. 1153-1154].)

█ Clearly the present case is one similar to *Hicks* as it was necessary for Officers Hackney and Porter to move and/or manipulate each of the items ultimately identified as contraband. Appellant's assertion to the

contrary notwithstanding, it was upon *Hicks* that the lower court rested its decision to suppress.

"In regards to various items that were referred to in the testimony, kind of break it down into two different categories.

"First of all, the category of the guns that were in the safe. That is one general area that can be isolated. As I understand the testimony, those guns were all seized before any information was had that they were stolen. And it appears to the Court based on Arizona v. Hicks that that seizure, the fact they were taken and removed from the house by the sheriff's deputies on that date without any probable cause to believe they were stolen would require that they, the evidence of those weapons be suppressed in this hearing, and I do make that order.

"The other category would be the category of the VCR's, TV's and clocks. And again, Arizona v. Hicks talks about the efforts of officers to look for a serial number on equipment where the serial number was not immediately obvious to them on initial glance at that article. Of course, that's exactly what the officers did here. They had to move these individual items around to determine the serial numbers before they could use the serial number information and run the checks on the serial numbers." The trial court continued: ". . . What they did was they completed in essence their search for narcotics. Then in essence, and I think it was clear from the testimony and I so find, that the additional search of the TV's and VCR's and clocks was for the purpose of determining if in fact those items were stolen property.

"And as Hicks is clear, you have to have—it sets the standard for searches beyond the parameters of the legitimate reason why the officers are in a particular situation. They need probable cause to do that. They did not have probable cause from the evidence in this case as far as I can determine to search for stolen property."

As noted earlier, our disagreement with the lower court is not with its selection of *Hicks* as the applicable authority, but with its determination the officer's actions or "search" in moving the equipment to locate and run serial numbers was not supported by probable cause. Simply put, substantial evidence does not exist to support this finding by the trial court.

 We recognize the substantial evidence rule dictates we must review the whole record in the light most favorable to the judgment below and sustain that judgment if there exists evidence to support it which is reasonable, credible, and of solid value. (*People* v. *Johnson* (1980) 26 Cal.3d 557,

578 [162 Cal.Rptr. 431, 606 P.2d 738, 16 A.L.R.4th 1255].) We recognize as well that we do not reweigh the evidence, resolve conflicts in the evidence, or evaluate the credibility of witnesses. However, reviewing the evidence in the light most favorable to the judgment does not require us to limit our review to the evidence favorable to respondents. (*Id.* at p. 577.) ▮ And, in the present case, after application of the above rules, our review indicates the record reflects evidence which overwhelmingly supports the conclusion the officers had probable cause to search for stolen property. The uncontroverted evidence established:

(1) Between February and April 1985 Officers Hackney and Smithson of the Eastside burglary-theft detail received a series of phone calls from neighbors of respondents who reported large amounts of personal property being taken into respondents' residence at all hours of the day and night. The phone calls stopped after Hackney and Smithson contacted a workman at respondents' residence who told the officers not only was property moving in and out of the premises, but that respondent Andy Williams was not employed, yet he had money to pay for that property and for the work being done.

(2) About May or June 1985, Officer Porter of the burglary-theft detail investigated respondent Andy Williams on the complaint of a specific victim who told the officer he believed respondent was involved in the theft of his stereo equipment.

(3) Experience in the sheriff's office disclosed that people who deal in narcotics also deal in stolen property because they accept such contraband in lieu of money in exchange for drugs.

(4) During the execution of the search warrant which authorized a detailed and probing search of respondents' residence for narcotics, Officers Hackney and Porter observed an inordinate amount of television sets, video cassette recorders, stereo equipment, clocks, firearms, silverware and other household items. They knew from experience that firearms and electronic equipment are among the "hottest" items encountered by the burglary detail.

We believe these facts, when taken together, constituted probable cause—that is, facts available to the officers warranting men of reasonable caution to have the belief these items may have been contraband or evidence of a crime. (*Texas* v. *Brown* (1983) 460 U.S. 730, 742 [75 L.Ed.2d 502, 514, 103 S.Ct. 1535].) If the officers had probable cause for seeking a search warrant at this point, by the same token they had probable cause to search the items that presented themselves in plain view.

 Justice Scalia, writing for the majority in *Arizona* v. *Hicks, supra,* 480 U.S. 321 [94 L.Ed.2d 347, 107 S.Ct. 1149], stated with regard to legal searches of items in plain view in nonpublic places: "And the practical justification for that extension is the desirability of sparing police, whose viewing of the object in the course of a lawful search is as legitimate as it would have been in a public place, the inconvenience and the risk—to themselves or to preservation of the evidence—of going to obtain a warrant. See *Coolidge* v. *New Hampshire* [(1971) 403 U.S. 443] at p. 468, 91 S.Ct. 2039 (plurality)." (*Id*. at p. 327 [94 L.Ed.2d at p. 355, 107 S.Ct. at p. 1153].) The plain meaning of the court's statement is that if an officer is entitled to a warrant, he is entitled to a search of plain view items. The *Hicks* decision also makes it plain that there can be no search of items in plain view in nonpublic places upon any lesser standard of cause than a warrant would require. (*Id*. at pp. 327-328 [94 L.Ed.2d at pp. 355-356, 107 S.Ct. at p. 1154].)

 Because there is no reasonable, credible evidence of solid value to the contrary, the lower court erred in suppressing the evidence on the basis the officers did not have probable cause to search for stolen property. In fact, neither respondent can point to substantial evidence supporting the probable cause finding made below. Respondents cite two cases out of this court, *People* v. *Murray* (1978) 77 Cal.App.3d 305 [143 Cal.Rptr. 502] and *People* v. *Sedillo* (1982) 135 Cal.App.3d 616 [185 Cal.Rptr. 475] as support for the lower court's probable cause determination. However, each case is inapposite to the instant one.

In *Murray,* police officers entered a motel premises under authority of a search warrant which authorized seizure of a number of items which did not include television sets. The officers had general knowledge the defendant was fencing stolen property. The officers did not find the sought items but found, in a storage room and bedroom adjacent to defendant's office, numerous items, including a shotgun and 67 television sets, 20 of which had their serial numbers removed. This court held the plain view doctrine validated seizure of only the 20 sets without serial numbers. The court rejected the People's argument that the officers' general knowledge the defendants were fencing stolen property justified the seizure upon the theory the officers had probable cause to believe the items were stolen. Justice Brown wrote: "We decline to stretch the plain view doctrine to those limits as to do so would be to throw out the central purpose of a warrant, which is to interpose an unprejudiced and detached judicial mind between the officer and the seizure and to eliminate discretion in the officer. [Citations.] Notwithstanding a generalized suspicion that the television sets and other items had been stolen, and aside from the 20 television sets from which the serial numbers had been removed, the testimony at the preliminary hearing did not establish that the officers in fact knew which items were contraband and

which items legitimately belonged to the appellant." (*People* v. *Murray, supra,* 77 Cal.App.3d at pp. 311-312, fns. omitted.)

In *Sedillo, supra,* 135 Cal.App.3d 616, a Visalia police officer arrived at a Visalia residence pursuant to an assault with a deadly weapon dispatch. The officer noticed a lot of very excited people in the street. He was told the appellant, Sedillo, had assaulted a person there with a knife. The officer saw Sedillo running in the front yard of another residence. The officer identified himself and told Sedillo to stop. Sedillo ran into the house, and the officer followed. The officer did not locate Sedillo but found numerous items, which items were seized and later became the basis of appellant's conviction for receiving stolen property. This court reversed the conviction, holding the trial court prejudicially erred in denying Sedillo's suppression motion. We held that the evidence established the police officers had no more than a generalized suspicion the items were stolen, with no evidence the officers were aware of information to link any particular item to any particular crime. (*People* v. *Sedillo, supra,* 135 Cal.App.3d at pp. 621-622.) We also reiterated the rule that " 'the police must have a *specific* basis upon which to rationally select items as evidence of criminal activity under the plain view doctrine.' [Citation.]" (*Id.* at p. 623.)

*Murray* and *Sedillo,* however, are not dispositive of the instant case in respondents' favor, as they contend, because each case dealt with a different issue than the one presently before us. In *Murray* and *Sedillo,* we determined the seizure of the items at issue under the plain view doctrine was not proper. In the case at bench, we are presented with the issue of whether Officers Hackney and Porter had probable cause to *search* items discovered in plain view. This issue was not addressed or even presented in either *Murray* or *Sedillo.* In fact, our determination that the plain view search conducted by Hackney and Porter was supported by probable cause mandates that their seizure of the items was proper under *Murray* and *Sedillo.* Both cases stated a seizure of items in plain view would be proper if the seizing officers were in receipt of information through official radio transmission that the items were contraband. (*People* v. *Sedillo, supra,* 135 Cal.App.3d at p. 623; *People* v. *Murray, supra,* 77 Cal.App.3d at p. 310.) Such information is precisely what Officers Hackney and Porter were in receipt of before they seized the evidence at issue in this case.

█ █ In sum, after application of the substantial evidence test and the exercise of our independent judgment as to the correct application of the uncontroverted facts of the case to the constitutional standard of reasonableness (see *People* v. *Leyba* (1981) 29 Cal.3d 591, 597 [174 Cal.Rptr. 867, 629 P.2d 961]), we conclude, under the federal

authority[3] we have cited, that the trial court erroneously suppressed the subject evidence.

### B. *People v. Albritton.*

Independent of *Arizona* v. *Hicks, supra,* 480 U.S. 321 [ 94 L.Ed.2d 347, 107 S.Ct. 1149], respondents contend the judgment of the trial court should be sustained under *People* v. *Albritton* (1982) 138 Cal.App.3d 79 [187 Cal.Rptr. 652]. However, *Albritton* is of no aid to respondents because it is entirely distinguishable from the present case. In *Albritton,* unlike the case before us, an officer joined in a warranted search for narcotics for the *sole purpose* of conducting an exploratory search for stolen motor vehicles; he engaged in no other search, and stolen automobiles were found by him which, we held, should have been suppressed. Here, Officers Hackney and Porter were specifically commanded to search for and seize proscribed drugs; in the course of that search the officers observed in plain sight items they suspected were stolen. They then began a separate and proper plain view search followed by a seizure of those items.

The judgment of the trial court dismissing the information is reversed, and the trial court is directed to vacate its order granting respondents' Penal Code section 1538.5 motion to suppress evidence and to enter a new order denying said motion.

Martin, Acting P. J., and Best, J., concurred.

The petition of respondent Karen Williams for review by the Supreme Court was denied May 19, 1988. Mosk, J., and Broussard, J., were of the opinion that the petition should be granted.

---

[3] Federal authority is now controlling in California on Fourth Amendment issues. *In re Lance W.* (1985) 37 Cal.3d 873, 896 [210 Cal.Rptr. 631, 694 P.2d 744], states: "[A]lthough section 1538.5 continues to provide the exclusive procedure by which a defendant may seek suppression of evidence obtained in a search or seizure that violates 'state constitutional standards,' a court may exclude the evidence on that basis only if exclusion is also mandated by the federal exclusionary rule applicable to evidence seized in violation of the Fourth Amendment." (And the rule of *In re Lance W.* has been expressly applied to Penal Code section 1538.5 motions. (*In re William J.* (1985) 171 Cal.App.3d 72, 75 [217 Cal.Rptr. 163].)